MARINE IRON WORKS v. WIESS.*

(Circuit Court of Appeals, Fifth Circuit.    October 1, 1906.)

No. 1,480.

**1. ESTOPPEL—EQUITABLE ESTOPPEL—ACTS AND CONDUCT OF PARTY.**

Where plaintiff, for whom defendant had contracted to build a pleasure boat, to have a draft when completed not to exceed 23 inches, was present in person during a considerable part of the time while the boat was being built, and had a representative present during all of the time, if during such time he obtained knowledge that the boat when completed would exceed such draft, and about the amount of the excess, whether it was due to changes made by his request or to fault in the original plans, and thereafter, without announcing to defendant his intention to reject the boat on that ground, continued to make suggestions as to the construction and equipment, and of changes therein, which were carried out by defendant, which made substantial expenditures, in the reasonable belief that plaintiff intended to accept the boat, plaintiff thereby waived the objection of excessive draft, and was estopped to reject the boat on that ground; but such estoppel would not extend to matters of which he had at the time no knowledge, as to a guaranty of speed, which could only be determined after the boat was completed, unless he knew or should have known that the changes made at his request would affect the speed.

**2. SAME—ENFORCEMENT AT LAW.**

The principles of equitable estoppel are now applied and enforced as liberally in courts of law as in courts of equity, and where equitable estoppel is available as a defense in equity it is equally available at law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Estoppel, § 291.]

**3. SAME—ELEMENTS.**

It is not necessary that acts or declarations should be made to mislead in order to work an estoppel, but it is sufficient if they were calculated to and did in fact mislead.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Estoppel, § 126.]

**4. CONTRACTS—ACTION FOR BREACH—INSTRUCTIONS.**

Instructions given and refused considered, in an action against the builder of a boat for breach of contract and to recover payments made thereunder.

Error to the Circuit Court of the United States for the Eastern District of Texas.

George C. Greer, for plaintiff in error.

J. W. Terry, C. B. Martin, J. F. Lanier, and R. C. Duff, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge.    This is an action brought by William Wiess, the defendant in error, to recover from the Marine Iron Works, the plaintiff in error, three several installments paid on a contract by which the plaintiff in error agreed to construct for the defendant in error a stern wheel pleasure boat.    The contract is embraced in several

*Rehearing denied January 15, 1907.

communications passed between the parties, the portions of which necessary to the present consideration are as follows:

"Chicago, April 10, 1902.

"Capt. Wm. Wiess, P. O. Box 747, Beaumont, Texas—Dear Sir: We hereby confirm. but more in detail, the quotation made to you by our general manager under date of March 15th, when in Beaumont, Texas. We submit the following: To build for you on order a modern steamboat of steel construction, strictly first-class in all respects, designed, built, and fitted out especially for private pleasure purposes, to be of the following general description:

"Stern Paddle Wheel Steel Hull Steamboat.

Length of hull...............................................feet, 82
Beam at top of sides, amidships..............................feet, 17
Width on deck over guards....................................feet, 20
Draft all complete not to exceed.............................inches, 23
Flare of sides each 6 inches, total..........................inches, 12
Length over all, including paddle wheel......................feet, 97½

"The entire hull of the boat to be of the finest steel construction, containing five water-tight bulkheads. * * * We guaranty to make this a staunch and in all respects dependable boat, containing the best of modern design, material, workmanship, and fittings throughout. * * * All work guarantied strictly A-1 throughout; to be painted inside and outside, and as little cement as possible to be used. * * * One horizontal return flue, internally self-contained Clyde baffle back marine boiler, to be 6 feet diameter by 8 feet long. To contain Adamson ring circular furnace, 36 inches diameter, 77 inches long. Eighty-five lap-welded charcoal iron tubes, each 3 inches diameter by 77 inches long. Steam dome 36 inches diameter by 30 inches high. Grates arranged for burning soft coal. This boiler to be built by us under the U. S. rules and regulations, permitting the use of salt feed water where on occasion it may be necessary to use it. We guaranty the licensed steam pressure to be not less than 165 lbs., and that the hydrostatic pressure test be not less than 248 pounds, at which pressures said boiler is to be sound and tight. Fittings of best marine grade throughout, including double smokestack, telescoped, one inside the other, with air space between, and this to be hinged stack, counterbalanced for easily raising or lowering. * * * The equipment to be very complete, and in keeping with a private steam yacht of the character herein described, to include: * * * One hardwood steering wheel, 4 feet diameter over the handles, well mounted, and connected up to three balanced rudders. * * * It is our intention to make you this offer, to furnish a complete boat, ready for service in all respects, complete and A-1 throughout, and to deliver her to you with all requisite government papers, at Sabine Pass, Texas, for the sum of seventeen thousand eight hundred and fifty dollars ($17,850), in funds bankable at par in Chicago. We guaranty this boat running at a rate of over fourteen miles per hour, under good conditions as to water, wind, and operation. Every minute detail of the most modern method of best steel hull construction will be carefully considered, and such as in our judgment is best for the boat will be incorporated into the work. Completion latter part of August next. Name of steamer and hailing port will be put on in artistic shape and in position as required under the marine rules and regulations. Terms of payment as follows: Twenty-five per cent. cash guaranty payment; twenty-five per cent. additional when work is fully onehalf completed; twenty-five per cent. additional when work is completed and passed inspection at our dock; final twenty-five per cent. when delivery is made. We submit this to you in duplicate, asking that you kindly date, sign, and return the duplicate to us. We reserve the privilege of modifying minor details per drawings and specifications if such action on our part improves the boat or enhances its practical value. It is further agreed that any changes or alterations or additions that you may wish to make as pertain to the furnishings may be made on a debit and credit basis, without affecting the validity of this agreement. In due course a list of the small articles, such as

knives, forks, spoons. linen, etc., will be made up and sent to you, but it is the distinct understanding that these are to be complete throughout and of all good quality.

"Respectfully,          [Signed]  Marine Iron Works,

"W. G. Nourse, Manager."

"Beaumont, Texas, April 14, 1902.

"Mr. W. G. Nourse. Chicago, Ill.—Dear Sir: The contract for the boat in duplicate received Sunday morning, and I believe you have practically covered everything in the contract, including your drawing SPS.82o, as forming a part of the contract. However, you do not get a clause in this contract quite as broad as the one you left with me March 15th, in which you say that anything that may be overlooked shall form a part and parcel of the contract. The last paragraph on the first page, which is finished on the second page, is intended to cover that, but I do not think it quite covers it; hence, I take it that anything that particularly belongs to the boat that has been overlooked will be furnished by you, as per your agreement of March 15th, and I desire to say in this connection that I shall not be very exacting in anything that may have been left off. * * * There may be some other items overlooked, but I only want what properly belongs to the boat. I herewith return you duplicate contract, duly accepted by me, and also inclose you exchange of Beaumont National Bank on the Continental National Bank of Chicago for $4,462.50, which please pass to my credit. I also note that you will send me itemized list of furnishings mentioned by you. I also note that you think it will be the last of August before you can complete the boat. I truly hope that it will be early in August, so that the boat will arrive here the latter part of August, if it is possible for you to do so. Please acknowledge receipt, and oblige,

"Yours truly,          [Signed]  W. Wiess."

Chicago, April 17th, 1902.

"Capt. Wm. Wiess, P. O. Box 747, Beaumont, Texas—Dear Sir: Your valued favor of the 14th inst. received, inclosing your formal acceptance of our offer for steamboat; also, first payment on account of $4,462.50, which sum is placed to the credit of your account, with thanks. In regard to the completeness of the work, it was the writer's intention to make that statement in our specifications of April 10th fully as broad as in that of the offer of March 15th; but by a close comparison find that it was not quite as thorough in that regard as it should have been. However, the intention is there, and our offer to you of April 10th carries with it, as forming a part of it, our quotation of March 15th, and is so accepted by you. * * *

"Very truly yours,         [Signed]  Marine Iron Works,

"W. G. Nourse, Manager."

While the contract contained no provision therefor, it was understood and agreed by the parties that the defendant in error, Wiess, should be represented during the construction by a supervisor or inspector, who should overlook and observe the entire process of building and furnishing the boat in question; and the proof shows that all during the construction one Capt. Loving so represented the defendant in error. There is some contention as to the authority of the said inspector, the iron works contending that the said inspector was the lawfully authorized agent of Wiess, and duly authorized to represent him in the premises, and to ask and request and consent to all changes and modifications that were or might be made in the construction and furnishing of said boat, and Wiess contending that he employed the inspector to merely watch the construction of the boat, and that he was in nowise accorded the right of superintending, and that he had no authority to change any single thing in the contract. The evi-

dence, however, shows that Capt. Loving, the Wiess inspector, was present on the part of Wiess, and observed the entire construction of the boat, making suggestions as to changes, which were complied with by the iron works, and, if not complied with, reference was made to Wiess, and the matter then settled. The evidence shows that Wiess himself was present from time to time—in all, over three weeks—while the boat was under construction in Chicago, just before and after the boat was launched; and there is evidence tending to show that he then learned that the draft of the boat, when equipped and finished, would decidedly exceed the stipulated draft of 23 inches, and also tending to show that about that time, when changes were suggested by Wiess and Loving in the construction of the deck and cabin and in the machinery and furnishings, Wiess' attention was called to the fact that such changes would necessarily increase the draft of the boat. There is also evidence tending to show that Wiess at that time had formed the intention of rejecting the boat on account, among other things, of the draft. The evidence shows that, subsequent to the launching of the boat and the discovery that the draft would exceed 23 inches, Wiess encouraged the iron works to go on with the construction of the boat, and asked for and obtained many additions and furnishings and changes not called for in the contract; and in further encouragement and inducement for the iron works to go on and finish the boat paid the balance due on the third installment, which he now seeks to recover in this suit.

The evidence shows beyond any reasonable controversy that after the boat reached La Salle, Ill., on its trip to Sabine Pass, the defendant in error was fully informed and well knew, as acknowledged in his letter of November 10, 1902, that the draft of the boat was some 29 inches; and, after having that information, the evidence shows that he continued to call for and obtained many changes in the outfitting, machinery, and furnishings of the boat, at large expense to the iron works. In this connection it may be noticed that the original contract called for a hardwood steering wheel, four feet in diameter over the handles; that in Chicago this steering wheel was changed, at the suggestion of Capt. Loving, to a five feet wheel, and that two days after Wiess had informed the iron works that the draft of the boat was six to six and a half inches over the stipulated draft he complained of and called for changes in the steering wheel, and at his request then made, and at the expense of the iron works, a new seven feet wheel was substituted.

In regard to the steering wheel, Wiess, in his letter of November 15th, says:

"Now, in regard to the steering gear, that must be fixed. Taking into consideration a boat of that size and the wheel, a boy of Harry's age ought to be able to steer that boat with perfect ease; hence, there is something wrong in the arrangement. Now, in this connection, I am willing to say this: if you will fix the steering gear as Capt. Loving wants it, I will be satisfied, be it right or wrong. It seems to me that this is only about a day's work, but it should be done, and done at once."

The contract guarantied a speed of over 14 miles per hour, under good conditions as to water, wind, and operation. The evidence shows

that in regard to this matter it was contemplated by the parties, and practically so understood, that the speed guarantied was to be determined by a test common in such cases, and in relation thereto Wiess, in a letter to the iron works dated November 10, 1902, says:

"I think it well to call your attention to the fact, though you are aware of it, that the boat's draft is 6 to 6½ inches more than guarantied draught, which is very disappointing to me, as I am very much afraid that it will also have a tendency to reduce her speed, as well as being too much draught of water. As there was no place or opportunity of trying the boat's speed up to this time, I will ask where that will be determined. For the moment, I don't know of any better place than from the mouth of the Neches river to Beaumont, as the river is wide and deep, and we have the exact distances from Neches Bar to Beaumont. Should there be any current, the average current could be determined, or the boat could make the run on the fly up and down, dividing the time both ways and the distance both ways, which would give the speed fairly accurate; and in this connection I am willing to do all in my power to give the boat the full advantage of making the required speed. If necessary on the trial trip, in order to have full steam, a barrel of rosin might be put aboard for that occasion. In conclusion, trust everything will be expedited at La Salle.

"Yours truly,                                                           W. Wiess."

The evidence shows that after the changes and furnishings at St. Louis, the boat, with Wiess and family on board, proceeded on its voyage down the Mississippi, via Berwick's Bay, to Sabine Pass, the place of delivery under the contract, where it was at once attached in this suit. Extracts from Wiess' evidence, given on a former trial, were introduced on his own behalf as follows:

"Q. When you found out the fact that the draft of the boat was 29 inches or 29½, as you say there, did you tell the Marine Iron Works that you would not accept the boat with that draft? A. No, sir; I didn't have to. Q. You did not tell them? A. No, sir; I did not. Q. You did not tell them so at St. Louis, did you? A. No, sir. Q. Did you intend, when you found that out, to accept the boat notwithstanding that draft? A. I never made up my mind as to that, Mr. Greer, until after we left Memphis, and got somewhere near the mouth of the Red river. Q. I will ask you on that subject, if you did not testify before Judge Bryant at Sherman, when application was made to sell this boat, that you made up your mind before it left Chicago, not to accept this boat? A. At the price? Q. What is the price? A. At the contract price. Q. Have you not stated on several occasions that you had determined not to accept this boat even when you left Chicago, and you wanted to get it down to Sabine Pass where you could levy on it? A. No, sir. Q. I will try to refresh your mind. Did you not state to me down near the Opera House some few months since that you had determined not to accept this boat, and had your mind made up at Chicago, but wanted to get the boat down here so you could levy on it? Did you not state to me some few months since, near the time when this boat was sold, or while the application to sell was pending? A. I would not state positively what I stated to you. I will state exactly what I intended to do, if you want to know that. Q. That is exactly what I want to know. A. I did not believe when I left Chicago that I would ever put another dollar in her. I did not believe when we left St. Louis that I would ever put another dollar in her. I thought it possible that if that boat made the time, and was a dependable boat, I might take her for the money I had put in her already. I never made up my mind until we got about the mouth of Red river that I would not take the boat at all. When we got to Morgan City, I telegraphed to my stenographer to come there, and he came, and I dictated a letter to him, and sent him home to my attorney, and told him to come to Sabine Pass and attach the boat. Q. When you learned the draft at Chicago, you did not make up your mind to reject the boat on account of the

draft? A. No, sir. Q. You did not make up your mind to reject it on account of the draft at St. Louis? A. No, sir. Q. Didn't you write Mr. Nourse that you believed that you would accept the boat at Chicago or St. Louis? A. No, sir. Q. Didn't you have Mr. Nourse at St. Louis to put in various furnishings and some extras in that boat? A. Yes, sir. Q. Well, why did you do that? Was it because of a purpose to take the boat at that time? A. I wanted to get as much in there for the value as I could get in. I knew I had lost if they loaded her down with furniture. I wanted to get as near the value as I could. Q. I want to know for what purpose you wanted the value in that boat? A. I had $13,387.50 in the boat, and the more furniture I could get in there the nearer I would come to getting some of the money back. Q. That is, if you attached it, or accepted it at that price? A. I did not expect to have to attach the boat. I expected to have Capt. Pulver stay at Sabine Pass with her, and wait until they adjusted the matter at that time. Q. When you got to Sabine Pass, did you notify Mr. Nourse, the manager of the Marine Iron Works, that there were certain things wrong, and give him an opportunity to fix them up? A. I notified his master and agent. I asked him this question: 'Capt. Pulver, are you the agent of the Marine Iron Works?' He said, 'Yes.' I says, 'Is that the boat that is to be delivered to me under that contract?' He said, 'Yes.' I says, 'I don't want it,' and turned to Mr. Diff, and he told the sheriff to attach it. Q. You had carried the writ of attachment with you? A. Yes, sir. Q. Three or four days previous to that you had left the boat at Wick's, La.—three or four days previous to that? A. Yes, sir. Q. You did not notify Capt. Pulver that you would attach it unless certain things were done? A. No, sir. Q. You went down and asked Capt. Pulver if that was the boat he tendered, and he said yes, and you attached it? A. Yes, sir. Q. You saw everything on that boat, didn't you? A. Well, everything that could be seen: everything that was accessible to my eye I saw. Q. Did you tell Mr. Nourse that you would not accept that boat unless those chocks were galvanized iron at St. Louis? A. No, sir. Q. Did you tell him that you would not accept it unless those cleats were of galvanized iron? A. No, sir. Q. Did you tell him that unless the floors were laid diagonally instead of straight up and down, you would not accept the boat? A. No, sir. Q. Did you tell him that on account of the additional draft, you would not accept the boat? A. No, sir. Q. Did you tell him that as to any of those things you urge? A. No, sir. Q. Did you ask him to remedy any of those things at St. Louis? A. No, sir. For one month, very nearly, before the boat left Chicago, I absolutely quit kicking. I called Capt. Loving to my room, and said to him: 'Capt. Loving, don't you make another kick. We will get nothing. Let them finish the boat, as they have started it.' I quit kicking."

Letters of Wiess read in evidence show that just before the boat left Chicago, and at La Salle and St. Louis, and up to the time the boat, supposed to be fully equipped, furnished, and supplied, left St. Louis, he made many suggestions, requests, and demands for changes in the outfitting and furnishing of the boat, and the undisputed evidence is that most, if not all, were complied with.

In the pleadings Wiess alleged as defects in the boat and violations of the contract the excessive draft, the construction and fittings of the boiler and its inadaptability for use of salt water, and the inability of the boat to make the guarantied speed, and in detail many minor matters of defective construction, outfitting, arrangement, and workmanship, entitling him to reject the boat, and recover the installments paid, and he prayed for suitable relief.

Besides the general denial, the iron works pleaded specifically to all the matters alleged as defects in the boat, and particularly as to the draft and many other matters, a waiver and an estoppel growing out of the knowledge and conduct of Wiess and his inspector while the

work of construction was going on, and as to the speed pleaded the wrongful attachment of the boat at Sabine Pass before tender and an opportunity to put the boat in shape for a speed test, and also a waiver and estoppel growing out of changes in the construction and arrangements, which changes were made at the request of Wiess and his inspector.

In said answer it was averred that Wiess knew at Chicago and St. Louis, before the boat left said places, the draft of the boat and all the other defects of which he now complains, except the speed; that at Chicago he secretly conceived the purpose to reject the boat, regardless of what the speed might be, because of the matters he then knew and of which he now complains, but willfully concealed said purpose, and thereafter induced the iron works to complete the boat, make various expensive additions to and modifications of the boat, and bring it to Sabine Pass at a cost of $3,429.33, intending, by concealing the purpose and calling for further modifications and additions to the boat, to induce the Iron Works Company to pay out such large additional sums of money thereon and bring the boat to Sabine Pass, so that he might have the opportunity to sue in Texas and attach the boat, and thereby get the benefit of such additional expenditures; and that by his acts, conduct, and declarations he gave the Iron Works Company to understand that he would not exact a strict compliance with the terms of said contract, and would accept the boat as constructed as a full compliance with the contract; and that he induced the Iron Works Company to believe that he was fully satisfied with the construction, and to bring the same to Sabine Pass; that with full knowledge of the construction he was urgent and insistent on its being delivered at Sabine Pass, and never at any time indicated a purpose to reject said boat or rescind said contract. The Iron Works Company pleaded as a counterclaim the construction of the boat according to the contract, except as changes were made at Wiess' request, and asserted the right to recover the unpaid installment, for which it prayed judgment.

The bill of exception shows that on the trial before a jury, and over the objections of the Iron Works Company, the court charged the jury in the matter of the waiver and estoppel as follows:

"I do not think the case as developed falls within what might be termed the rule of estoppel. It would probably be a matter of waiver or change of the contract by the parties if the evidence warrants the belief that they did waive any of the matters or change the contract. Now, the defendant is the party that undertook to build this boat, and it is fair to presume that they knew more about the effect of added weight than the plaintiff would, because he was not a boat builder, as shown by the evidence. Therefore, in order to bind the plaintiff on that phase of the case, the evidence must show to your minds that Mr. Wiess understood that the changes would make the draft deeper, and, so knowing it, consented to it and approved it. If the proof goes to that extent, it would be a waiver, otherwise there would be no waiver; in other words, the evidence would have to show that he had such knowledge, and consented to such changes and approved them."

Also, in regard to the question of draft:

"The original contract, as I remember it, was that the draft should be 23 inches. If you believe from all the evidence in this case that if the boat

had been constructed as originally designed, and would still have exceeded the contract draft, this waiver of Mr. Wiess, if there was a waiver, would not operate in a case of that kind, if the boat had been constructed as originally designed and exceeded the draft; but upon that question you are to determine whether or not there were changes, and, if there were changes, did they increase the draft of the boat over what it would have been if constructed as originally designed and contracted for, and if they did increase it over that, did Mr. Wiess know it and agree to it, or by his actions impliedly agree to it, by which defendant had the right, under the circumstances, to infer that he did? These are questions for you to determine from all the evidence in this case."

And that the court refused, among others, the following requested special instructions, to wit:

Special instruction No. 2:

"You are instructed that if you believe the plaintiff, William Wiess, or his agent, W. O. Loving, after the making of the written contract offered in evidence, requested that any part of said boat be modified or changed, or be made in a particular way or of certain material, and a change was made by defendant, or a part was constructed in accordance with such request, then you are instructed that the plaintiff had no right to reject said boat on account of any variance from the written contract or defect caused by such request or authorized change."

Special instruction No. 10:

"You are instructed that if you believe from the evidence that the plaintiff, William Wiess, either at Chicago or St. Louis, had full knowledge of any part of the steamer John H. Kirby which he now charges as being at variance with the contract, and if you further believe that, notwithstanding such knowledge, the plaintiff, William Wiess, by his subsequent acts, conduct, or declarations, led the defendant to believe that he would accept the boat notwithstanding such variance, and that the defendant, the Marine Iron Works, was reasonably warranted in such belief, and acting on such belief incurred further substantial expenses, which it would not have otherwise incurred, either in carrying said vessel to La Salle, or doing work on the same there, or in carrying the same from La Salle to Sabine Pass, or in expenditures at St. Louis, then you are instructed that in respect to such parts of the said boat the plaintiff, William Wiess, cannot claim a breach of contract, and cannot reject the boat and recover on account of such variances, if any exist."

Special instruction No. 9:

"You are instructed that if you believe from the evidence that the plaintiff, William Wiess, knew either at St. Louis or at Chicago that the draft of the steamer John H. Kirby exceeded 23 inches, and knew what the draft was at such places, or either of them, and with full knowledge of said facts, by his subsequent acts, declarations, and conduct, led the defendant to believe that he, plaintiff, would accept said boat, notwithstanding said draft; and if you further believe that the defendant was reasonably warranted in such belief, and acting on such belief incurred further substantial expenses that it would not otherwise have incurred, then you are instructed that the plaintiff, William Wiess, has thereby waived the right to reject the boat, on account of such excessive draft, if any, and that he is estopped to claim a breach of said contract by reason thereof, and cannot recover herein on those grounds."

There is no question but that the instructions refused were seasonably presented, and covered issues presented in the pleadings supported by evidence showing, and tending to show, such issues were material.

The charge of the court as given practically precluded the jury from considering the waiver and equitable estoppel pleaded as applicable

to the main issues in the case, because it eliminates equitable estoppel as such from the case, and defines waiver to be equivalent to consent and approval, without regard to the conduct, acts, or declarations of the plaintiff below; and because it instructed the jury in regard to the issue of excessive draft that if the boat, constructed as originally designed, would have exceeded 23 inches in draft, plaintiff's consent to the increased draft, under such circumstances, could not have precluded him from afterwards rejecting the boat for excessive draft.

We think it clear that the waiver of a right or benefit may be established by the actions, declarations, acquiesence, even silence, of a party, as well as by his expressed consent and approval.

"Waiver, in a general way, may be said to occur wherever one in possession of a right conferred by law or contract, and knowing the attendant facts, does or forbears to do something inconsistent with the right, or of his intention to rely upon it, in which he is said to have waived it; and he is estopped from claiming anything by reason of it afterward." Bishop on Contracts, § 792.

"While a waiver is not in the proper sense of the term a species of estoppel, yet where a party to a transaction induces another to act upon the reasonable belief that he has waived or will waive certain rights, remedies, or objections which he is entitled to assert, he will be estopped to insist upon such rights, remedies, or objections to the prejudice of the one misled." 16 Cyc. 805.

"Where a person tacitly encourages an act to be done, he cannot afterwards exercise his legal right in opposition to such consent, if his conduct or acts of encouragement induced the other party to change his position, so that he will be pecuniarily prejudiced by the assertion of such adversary claim." Swain v. Seamens, 9 Wall. 274, 19 L. Ed. 554.

In regard to the stipulated draft of the boat, we are unable to see why Wiess could waive it if caused by changes in construction and added outfitting and furniture, but could not waive it if a fault in original design. It seems clear that at any time before tender of the boat under the contract, if Wiess was informed that the draft of the boat was bound to exceed 23 inches, he could have said to the iron works, "I can reject the boat for excessive draft, but while I am disappointed in that matter, still if you will make certain changes in the machinery and outfitting and furniture, I will waive my right to reject on account of excessive draft," and then, if the changes indicated had been made, Wiess would be bound by his waiver. If Wiess could thus waive his right by definite words and promises, why could he not do it by actions commonly said to "speak louder than words?"

"Where a person, with actual or constructive knowledge of the facts, induces another by his words or conduct to believe that he acquiesces in or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice." 16 Cyc. 791.

The special instructions requested should have been given to the jury. They certainly were material under the pleadings and evidence, and the points involved were not adequately and correctly covered by the general charge as given.

In special charge No. 2, the proposition seems too clear for discussion. Although the court charges the jury that good faith is immaterial in the performance of a contract of the kind in suit, we cannot sup-

pose that it was meant thereby that if Wiess requested a change from the contract in the construction of machinery or outfitting of the boat, that he could at pleasure thereafter reject the boat when tendered because of the change he had expressly requested. In such a case we are sure that good morals and sound law are found in harmony.

The other charges correctly state the law as it should be applied in this case under the statement of pleadings, facts, and evidence hereinbefore recited. It is immaterial whether we consider the rule to be applied one of equitable estoppel, pure and simple, or as one of waiver from which estoppel results (see definitions of waiver above given); the principles involved are the same. The case shows that under the contract the iron works was to build for Wiess a particular kind of pleasure boat, of full value, perhaps, to Wiess for his purpose, but not likely to be in demand among shipowners or in the general market; that the contract contemplated in the course of construction changes in furnishing and outfitting might be required by Wiess and made by the iron works; that during the construction, furnishing, and outfitting Wiess was present much of the time in person, and was all the time represented by an agent, and both knew before the boat left Chicago that the draft was bound to exceed 23 inches, and yet, knowing this fact, Wiess requested and required changes in many matters, well knowing that thereby the outlays and expenditures of the iron works would be increased; that while the boat was at La Salle, Ill., Wiess was informed and well knew that the draft of the boat was 6 to 6½ inches in excess of the draft stipulated in the contract, and, knowing the same, he then and thereafter called for changes in the outfitting and furnishing at a largely increased expense to the iron works; and that Wiess in his own evidence admits a secret purpose at Chicago, as well as at St. Louis, to ultimately reject the boat, and claim rescission of the contract, and yet called for more furniture and equipment so, as he says, to get more value in the boat, with a view to subsequently acquire the same as part of the contract price, and, failing that, to have the boat attached in the Texas courts. The case thus made, whether strictly one of waiver or not, requires that the principles underlying equitable estoppel should be applied. These principles are now applied and enforced as liberally in courts of law as in courts of equity, and where equitable estoppel is available as a defense in equity, it is equally available at law, and ought to be as liberally applied to promote the ends of justice and secure fair dealing. Dickerson v. Colgrove, 100 U. S. 582, 25 L. Ed. 618; Wehrman v. Conklin, 155 U. S. 327, 15 Sup. Ct. 129, 39 L. Ed. 167. It is not necessary that the acts or declarations should be made to mislead in order to work an estoppel. Mfrs. & Trad. Bank v. Hazard, 30 N. Y. 230; Dickerson v. Colgrove, supra; Continental Nat. Bank v. National Bank of the Commonwealth, 50 N. Y. 575. It is enough that the acts are calculated to mislead, and do mislead, and to permit the contrary to be asserted would subject the party relying on the same to loss or injury. See cases last cited. A mere standing by in silence, and permitting another to alter his position, will sometimes estop one from asserting a right or claim when such assertion would inflict loss or injury on such party. Mor-

gan v. Railroad Co., 96 U. S. 720, 24 L. Ed. 743; and the reports are full of other cases. If the alleged defects in the construction of the boat or breaches of the contract to complete the same grew out of alterations or modifications of the plans and specifications made at the request of Wiess and his agents, Wiess ought certainly to be estopped from asserting the same against the iron works.

"The estoppel here relied upon is known as an equitable estoppel, or estoppel in pais. The law upon the subject is well settled. The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice. It is available only for protection, and cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond this limit. It is akin to the principle involved in the limitation of actions, and does its work of justice and repose where the statute cannot be invoked." Dickerson v. Colgrove, 100 U. S. 580, 25 L. Ed. 618.

In Lawrence v. Dale, 3 Johns. Ch. (N. Y.) 23, 41, Chancellor Kent, in dealing with a contract for the building of a particular boat for a particular trade, thus forcibly expressed himself:

"If the law allows a party to abandon a contract while in fieri, he ought at least to act promptly and decidedly on the first discovery of the breach. If he negotiates with the party afterwards, and permits the work to go on, he certainly waives all right to abandon. There is not a cause to contradict this doctrine, which is founded on the plai...st principles of justice."

And in Pokegama Sugar Pine L. Co. v. Klamath River L. & Imp. Co. (C. C.) 96 Fed. 54, it is forcibly said by Judge Morrow:

"Assuming that the complainant failed to fully perform the conditions of the lease entered into with the respondent, as stated in a former part of this opinion, and that this failure resulted in the right of the respondent to demand a forfeiture of the lease in September, 1897, it is nevertheless clear that the subsequent transactions just related give to the case a different aspect. Every consideration of right and justice required that under the circumstances the forfeiture should have been asserted promptly, and a return of the property demanded as soon as the default of the complainant had become an established fact. But here we have the officers of the respondent standing by while large expenditures were being made for the benefit of the plant and dealing with the manager of the complainant with respect to important matters with every appearance of assenting to the continuance of preparations for the future operation of the plant on a large scale. The fact that John R. Cook persisted in his objections, during the season of 1897, that the plant was not being operated successfully, or to its full capacity, is not sufficient. He knew all the facts, and should have asserted then the right of forfeiture now claimed by the respondent as a defense to this action."

The tenth assignment of error complains of the refusal of the court to charge the jury as follows:

"You are instructed that if you believe from the evidence that the defendant, at the request of the plaintiff, Wm. Wiess, or his agent, W. O. Loving (provided, in the latter instance, you further believe that Mr. Loving was authorized by plaintiff, Wm. Wiess, to request and suggest for plaintiff how particular parts of said boat should be made), constructed parts of said boat of heavier material than that required under the written contract offered in evidence, and if you further believe that by reason thereof the draft of the boat

was increased or the speed decreased, then you are instructed that the plaintiff cannot, on account of such added draft or decreased speed, recover in this suit, nor did he have, on account thereof, the right to reject the said vessel."

So far as this charge refers to the draft of the boat, its equivalent has been hereinbefore considered. So far as it relates to speed, it is objectionable, because it leaves it immaterial whether Wiess at the time of requesting or suggesting changes of construction knew or ought to have known whether the changes requested would unfavorably affect the speed.

The fourteenth assignment of error complains of a refusal to charge the jury as follows:

"You are instructed that if you believe the steamboat John H. Kirby, as delivered at Sabine Pass, Texas, was capable of running at a rate of over fourteen miles per hour, under good conditions of wind, water, and operation, or if you believe that by remedying minor defects, if any existed, and by adjusting the parts of the machinery and putting the boat in proper condition for a speed test, said boat would have been capable of running at a rate of over fourteen miles per hour under good conditions as to wind, water, and operation, then you are instructed that the plaintiff could not, on account of the speed, reject said boat, if it in other respects substantially complied with the contract, and complied with it except in such particulars as may have been waived by plaintiff, according to what is necessary to constitute waiver as given you in other portions of my charge."

On the question of speed, the court charges the jury as follows:

"The contract was that the boat furnished should be capable of making over 14 miles per hour, under good conditions as to wind, water, and operation. Now, if this boat, under the conditions named in the contract, was not capable of making that speed, and you should so find from the testimony, then you should find for the plaintiff for the amount sued for by him in this case. If you find from the evidence that the boat, under the conditions named in the contract, would make the speed contracted for, then that issue would be in favor of the defendant in the case. You are to determine it from all the evidence. It appears that the parties had not made a trial test of the speed of the boat. Of course, it was necessary that the speed of the boat should be decided, although the contract had not provided for where the test should be made, and had not provided for the test. The defendant contracted to build a boat that would make this speed under the conditions named in the contract; that is, good conditions as to wind, water, and operation would make a speed of over 14 miles per hour. Both parties to the contract are bound by that provision, and it is for you to determine whether or not, under the conditions named in the contract, that boat was capable of that speed. If not, then the boat was not in substantial compliance with the contract, and plaintiff was not bound to take it. If it was, the plaintiff would not have the right to reject it on that account. * * * Of course, in order to fairly test the boat, the conditions of the contract should be complied with; that is, as to proper adjustment of the machinery and favorable conditions as to wind, water, and operation. Downstream with strong current was not to be the test, nor was the test to be upstream against a strong current, but, under the evidence in this case, such test would ordinarily be made in practically still water, with the machinery in proper condition, with proper fuel and proper co-operation between the engineer and foreman, and with proper adjustment of the machinery. But, gentlemen, the question remains, was this boat capable, under good conditions as to wind, water, and operation, of making a speed of over 14 miles per hour? If it was, then in that particular it was a substantial and literal compliance with the contract, and you will find for the plaintiff."

These directions fairly include the substance of the charge requested, and, as there were no objections taken to them on the trial, plaintiff in error ought not to complain.

The fifteenth assignment of error complains of the refusal to give a special charge as follows:

"You are further instructed that if you believe from the evidence that the plaintiff, William Wiess, either at Chicago or St. Louis, had made up his mind to reject said boat on account of defects or variance from the contract then appearing to him and then known to him, and he, subsequent to so making up his mind, induced the defendant to make changes in said boat and to bring the boat to Sabine Pass at the expense of the defendant, or to do work at its expense that it would not have incurred had it been promptly notified of the purpose of the plaintiff, and if you believe from the evidence that his purpose to reject existed regardless of what the speed might be of the said boat, then you are instructed that the plaintiff would be estopped by reason of such conduct from rejecting the boat, and in such case you will find for the defendant for the balance due on the contract price, less such allowance or deductions as the plaintiff would be entitled to under the evidence for remedying any defects that may have existed."

In the matter of speed, the iron works guarantied the boat to be capable of running over 14 miles per hour under good conditions as to water, wind, and operation. This guaranty was a distinct and substantive proposition, in regard to which nothing could be definitely and certainly known until after completion of the boat, and a test under proper conditions was made, and although Wiess during construction may have had an intention to reject the boat on account of defects in the boat and variances from the contract then known to him, and thereafter induced the Iron Works Company to make changes in the boat and incur expenses in carrying out the contract, he could only have misled them into the belief that, notwithstanding the variances then known to both parties, he would accept the boat when finished; and it would seem that he ought not to be estopped thereby from thereafter insisting on his warranty as to speed, unless he knew or ought to have known that the changes he requested would affect the speed. Certainly, Wiess cannot be held to have waived defects that he did know existed, and in this connection it may be said that whether or not the boat could make the guarantied speed is not known up to this time. In the matters wherein Wiess, by declarations and acts, misled the iron works to its injury, let him be estopped, but the estoppel should not be extended to cover matters not then under consideration or being dealt with. That Wiess intended to insist on the warranty of speed, and that therein he did not mislead the iron works, is shown by his letter of November 10, 1902, wherein he complains of the excessive draft, and proposes a speed test, suggesting the kind and place. This letter is a standing notice that Wiess would insist on the speed test, and is a sufficient answer to counsel's contention in brief and argument that in objecting to receive the boat on account of deficient speed Wiess is changing his position, getting another and better hold.

Under this assignment of error, counsel further contend that the warranty of speed was a continuing warranty, and not a condition precedent, and that failure therein did not authorize the rejection of the

boat, but left Wiess to an action for damages; and also, that before the boat could be rejected on account of speed, a test should have been made under favorable conditions, and that, as Wiess attached the boat before a test could be made, he was equitably estopped from rejecting the boat on account of speed. Neither one of these questions is fairly presented on the record as made or in the errors assigned. The fifteenth assignment of error is not well taken.

The fifth assignment of error complains of the refusal of the court to give the following instructions:

"It is a question of fact presented to you as to whether or not W. O. Loving, as agent for William Wiess, was authorized to suggest and request changes or modifications in the construction of the boat John H. Kirby, or to suggest and request how parts of same should be constructed in points where the contract was silent, and if you believe from the evidence that W. O. Loving was the agent of William Wiess, clothed in such authority, then his acts in making suggestions and requests would have the same legal effect as if they were made by the plaintiff, William Wiess, himself; and in this connection, if you believe from the evidence that the plaintiff, William Wiess, requested any changes or modifications in the parts of said boat, or requested that certain parts should be made in a certain way or of material heavier than that required under the contract, or that his agent, W. O. Loving, made such suggestions and requests (if you find that said Loving was such agent), then plaintiff, William Wiess, could not be heard to object to any such modifications, changes, or parts as he or his agent either suggested or requested. However, if you believe from the evidence that the said Loving was not authorized as the agent of said William Wiess to make suggestions and requests for modifications or changes in said boat, or as to the construction of parts of same, then you are instructed that the plaintiff, William Wiess, would not be bound by such suggestions or requests of W. O. Loving, if any, unless the plaintiff afterwards knew of and approved the same, in which event his approval would amount to a ratification, and would have the same legal effect as though he had in the first instance authorized such requests or suggestions for changes or modifications."

This requested instruction seems to embrace the law of principal and agent as applicable to the facts of this case, and we see no reason for the refusal to give it to the jury, unless the substance was embraced in the general charge. In the general charge it is assumed that Loving was the agent of Wiess, but no instructions on the issue as to whether Loving was the agent of Wiess, and, if such agent, the scope of his agency, were given to the jury.

The seventeenth assignment of error complains of the refusal of the court to give the special instruction as follows:

"If you believe from the evidence that the defendant, Marine Iron Works, used proper care and diligence in selecting and installing the cylinders in the engines of the steamboat John H. Kirby, and without fraud and in good faith installed the cylinders in said engines, believing them to be sound, and in which sand holes or other defects afterwards appeared, but which were hidden or latent at the time same were installed, you are charged that such defects, if any, would not entitle the plaintiff, William Wiess, to rescind said contract and refuse to receive said boat, but such defects would only entitle said defendant to an abatement of the contract price for said boat in the amount reasonably necessary to purchase and install proper cylinders in said engines, unless you further believe from the evidence that said defects were developed before said boat was tendered, if it was tendered to the plaintiff, William

Wiess, and the defendant, Marine Iron Works, refused to install the proper cylinders in said boat within a reasonable time thereafter."

The propositions contained in this request seem to be sound in law and pertinent under the evidence. The general charge treats the issue on defective cylinders_as immaterial, but, as it was made in the pleadings, and much evidence taken thereon, we think the defendant below was entitled to the instruction asked, or else one to the effect that the issue was immaterial.

This disposes of all the errors assigned considered material here or on a new trial.

The judgment of the Circuit Court is reversed, and the cause is remanded, with instructions to set aside the verdict of the jury, and award a new trial.