**THOMAS GAFFNEY, Plaintiff**

v.

**THE VIRGIN ISLANDS PRODUCTS CORPORATION,
Defendant**

## No. 77

### District Court of the Virgin Islands

Frederiksted Sub-Judicial District
St. Croix

## May 26, 1930

**WILLIAMS,** *Judge*

This action arises out of a contract between the plaintiff and the defendant dated January 20, 1926, and sworn to on the 21st day of January, 1926. The contract covers two separate and distinct matters, though both concern the parties hereto mentioned; the first is in substance, and is in fact, called a lease, while the second provides for the payment, and the securing of the payment, of four thousand five hundred two dollars and fifty three cents, ($4,502.53) United States Currency, to the plaintiff. It is with the latter subject matter that we are concerned in this case.

The undisputed facts leading up to the suit are these:

That, for a year or so before the execution of said contract, the defendant corporation had been preparing for, and engaged in, the erection of an industrial alcohol plant, on the land of the plaintiff, which was occupied apparently on some verbal arrangement, but on the 20th day of January, 1926, their arrangement was reduced to writing, being embodied in said contract; that the plaintiff advanced money from time to time during the construction of the plant, and also earned a salary as manager, aggregating, at the time of the execution of the contract $4,502.53 United State Currency. These advances, and the forbearance to collect salary, were due to the fact that the company's treasury was — if not then deplete — unavailable, and the

money had to be procured from some other source or the work would have to be discontinued, so the plaintiff advanced the money and let his salary remain on account. This matter was also embodied in the contract, and it is with it that we are now concerned.

The material part of the contract is as follows:

"The Virgin Islands Products Corporation acknowledged its indebtedness to Thomas Gaffney as per statement rendered for various monies and cash advanced and paid by him on behalf of the Corporation for various materials and labor also salary due him to date, amounting in all to four thousand, five hundred and two dollars and fifty three cents ($4,502.53) United States Currency.

"The Corporation agrees to pay off this indebtedness from its first earnings before any dividends are paid on either common or preferred stock. This money is to bear interest at six per cent per annum.

"As security for this indebtedness the Corporation agrees to execute a note for the sum of $4502.53 in favor of Thomas Gaffney which note will be signed by the President and Treasurer of the Corporation and shall constitute a first lien on the Corporation's assets after the United States Government; any other lien given by the Corporation shall be subject to the two herein mentioned and cannot take effect until the said lien or mortgage given to Thomas Gaffney is paid off.

"This written agreement constitutes the entire transaction and obligations of both parties and supersedes replaces and make null and void all preliminary correspondence and verbal agreements.

"Nothing in this agreement shall be changed unless mutually agreed to in writing by both parties."

It is also undisputed that the defendant corporation executed a mortgage on the 31st of April, 1926, to Michael J. Nolan, the father of the President of the defendant corporation, for $8,000.00, on the face of which mortgage it takes effect against the assets of the company subject only to any claims that the Government might have. It further appears that the following promissory note was given to

the plaintiff as a consequence of the portion of the agreement:

"$4,502.53
Frederiksted, St. Croix,
Virgin Islands, U. S. A.
April 3, 1926.

"In consideration of the receipt of forty-five hundred and two dollars and fifty three cents ($4,502.53) U.S. Currency in hand paid to the Virgin Islands Products Corporation, receipt of which is hereby acknowledged, the said Corporation agrees to repay said sum, together with interest at six per cent from Feb. 1, 1926, out of the accumulated profits, when same have reached said amount, or at the option of the Corporation to make payments on said sum from time to time as the profits may accumulate, and this instrument shall be a prior lien, after the United States Government, on the property of the Corporation as against any lien which may be hereafter held by any private Corporation or individual.

"(SEAL)
/s/ J. J. Nolan,
President.
/s/ I. G. Nolan,
Secretary."

There was some disagreement between the plaintiff and the President of the company, the said James J. Nolan, which arose a few months after the execution of the contract, and continued on down to the bringing of the suit, and there is testimony to the effect that Gaffney never accepted the note as being the one called for in the contract, and that the defendant company knew of his dissatisfaction with the note, but the matter now rests exactly as it was then; that the interest called for in said contract has always been paid, and apparently in accordance with the requirements of the contract.

The plant was finally gotten into operation, but because of various obstacles and vicissitudes, it was claimed that no profits were made; that all of the income was expended for necessary things to keep the plant in operation. This statement was made in answer to the demand of the plain-

tiff that his claim be paid, but he being apparently not satisfied with the correctness of this information, filed an "Action For Debt" on the 10th day of August, 1929. The complaint, after reciting the organization of the corporation, indebtedness of the defendant, the execution of the agreement, and that by the agreement "the defendant bound itself to pay the said indebtedness to Plaintiff out of its 'first earnings,' " — concludes thus:

"The Plaintiff further alleges, upon information and belief, that since executing and delivering to the Plaintiff the aforementioned agreement, the Defendant has had earnings and first earnings and divers other earnings, notwithstanding which the Defendant has failed, refused and neglected and fails, refuses and neglects to pay to the Plaintiff its indebtedness to him although Plaintiff has made demand for payment.

"Wherefore Plaintiff demands judgment against the Defendant for the sum of $4502.53 United States Currency, together with interest at the rate of 6% per annum from the 20th day of July, 1929, and all costs, plus reasonable attorney's fees." The same was signed by the plaintiff, Thomas Gaffney, and sworn to before James Ross, Notary Public, on the 8th day of August, 1929, but actually filed on the 10th day of August, 1929. Following which the plaintiff filed what he denominated an "Amended Complaint" on September 5, 1929.

The record does not show leave granted for filing of this "Amended Complaint." However, the defendant company filed an answer to the said "Amended Complaint" on January 18th, 1930, to which answer the plaintiff filed a reply on the 8th day of March, 1930. It thus appears that by arrangement of the parties, the "Amended Complaint" was filed, the time of filing the various papers was waived, so both parties ignored the provisions of the Code as to the time of filing the various papers.

The "Amended Complaint" embodies the matter contained in the original complaint as a first count, and then in a second count he alleges (1) that the plaintiff failed to give a note in accordance with the requirements of the contract and, furthermore, (2) that notwithstanding the agreement contained in the said contract — that any other lien given by the defendant shall be subject to the indebtedness to the plaintiff — the defendant, as the plaintiff verily believes, has created another lien, which is not subject to the indebtedness of the defendant to the plaintiff, but has priority over the indebtedness to plaintiff, and thereby constituting a breach of the said contract by the plaintiff, and concludes with the same prayer as used in the first complaint.

It will be thus seen that in the first count the plaintiff predicates his action upon the existence of a contract, on account of which certain rights had accrued to him; whereas the second count, in its material part, predicates his claim upon the hypothesis of a breach of the contract which had taken place in April, 1926, some three and a half years before filing the "Amended Complaint", and for failure to give a note of the proper nature as required by the contract.

The defendant company, in its answer, denied that there had been any "earnings" or "first earnings" within the meaning of the contract, and also averred that, if any breach of the contract had taken place as alleged, it had been waived, and claimed that the contract was in full force and effect, therefore. It also averred that it had, in all respects, complied with the contract on its part.

At the trial, James J. Nolan, the President of the company, was thoroughly examined as to the books, as also the bookkeeper and previous bookkeeper, but it was not shown that there had ever been any "earnings" out of which dividends could be declared. The books were also produced in

court, submitted for examination of the court and all parties concerned, and though they have been examined it has not been found that there have been any "earnings" out of which dividends might have been declared.

It also appears from the evidence that there was some dissension amongst the promoters of the corporation at the time of the advancement by Gaffney and the obtension of the money from Mr. Nolan, senior, without which it is probable that the plant could not have gone into operation, the other parties to the promotion being the moneyed people in the matter.

Finally, after many vicissitudes, the plant was brought into operation, but it appears that at no time was it working at a profit in the sense of being able to declare dividends, or having any ready or surplus money.

Now, according to the plaintiff's construction of the contract, he should have received his money out of the very first monies coming into the hands of the company; that the company made no ultimate net profit was of no concern to him; that, according to his understanding of the contract, his rights began with the first proceeds or the first monies actually coming into the hands of the company, irrespective of the expenses of the company or anything else. In other words he construes "earnings" and "first earnings" to mean the first revenues or results of sale or business of the corporation. The defendant, on the other hand, contends that "earnings" and "first earnings" simply mean profits from which dividends, for instance, might have been declared, or moneys not immediately needed for the regular operation of the plant.

In 9 A. and Eng. Encyc. of Law, p. 682, it is said that: "The corporate funds from which dividends are payable are indiscriminately called 'profits', 'net profits', 'earnings', and 'net earnings'." Of course, the parties might give the word "earnings" or words "first earnings" one

291

of several meanings, as these words are, like most others, relative.

It appears from the contract that the plaintiff, Gaffney, was very much interested in the success of the Company he being, at the time, a stockholder, and an officer of the company at a fairly good salary. Therefore, it can hardly be inferred that he meant, by the agreement, that he was to take the first monies actually coming into the company's hands — irrespective of all business exigencies — because, by so doing, the continued operation of the company might be imperilled, and his hopes, as well as those of the others, be frustrated.

From the testimony, it appears that all parties thought this plant was to be an Eldorado, and it would only be a short time before his money would be repaid. He was to get his money from the "first earnings" and "before" any "dividends" were paid on other common or preferred stock, thus coupling dividends and earnings very closely together. This is the substance of the second paragraph above quoted from the contract, and it would seem to be fairly clear from it that his claim was to come from such monies as would, or could, ordinarily be converted into dividends. It certainly appears that the expenses of the company were contemplated, as it is not reasonably supposed that dividends would be declared immediately after money came into hand and before expenses of operation were paid. It would seem, therefore, that "earnings" and "first earnings" would mean such monies as would ordinarily go to dividends.

Now, as to the second count in the complaint: It is averred that the plaintiff waived the alleged breach of the contract as to the giving of the requisite note and in giving a lien which is not subject to the indebtedness of the plaintiff. That the defendant company breached the contract by giving the aforesaid mortgage, would seem to be beyond dispute, as in that mortgage it said that the mortgagee's

right would be subject to any claims on the part of the United States Government, but that it, nowhere, said anything regarding the claim of the plaintiff. In the reply of the defendant it is said that the plaintiff's loss of the lien was due to his own negligence or fault, but I do not see how his negligence, or fault, would, or could, affect the duty of the company, in view of its agreement that the claim due the plaintiff "should constitute a first lien on the Company's assets after the United States Government; any other lien given by the Corporation shall be subject to the two herein mentioned and cannot take effect until the said lien or mortgage given to Thomas Gaffney is paid off."

If the mortgage is valid — and nothing has been said or shown to the contrary — it certainly would, under the present state of things, take precedence over the plaintiff's claim and be subject only to any claim the United States Government may have. If the act of giving said mortgage is not a breach of the contract, it is difficult to conceive how a breach could be made of that provision of the contract. It has all the appearance of bad faith by the company — certainly, at least, a careless disregard of the terms of the contract — as the giving of the mortgage was explained only by saying that it was necessary to have funds, and that was the only way they could be procured. Even if the requirements as to the issuance of the note, and its being a lien, are void, it does not affect the obligation of the company to provide that a subsequent lien shall take subject to the claim of the plaintiff. If language means anything, it is perfectly clear to me that the parties understood by the contract that they had executed, drawn up by them without the assistance of counsel, that Gaffney's claim would be protected against all other liens than those arising in favor of the United States Government; that it was the duty of the company to provide in any subsequent instrument that the plaintiff's claim should take precedence over all

others than those of the United States Government — the latter being actually protected in this way — in the mortgage. It did not fail to mention that, although it very significantly failed to mention the plaintiff's claim. This failure, in my opinion, was a clear breach of the contract, on account of which the plaintiff could have had recovery if he had brought action at the time.

The question now is, however, is he entitled to recovery at this juncture of the matter? It is asserted by the defendant company that the plaintiff has waived his right to recovery because of the long lapse of time between the breach and his knowledge of it, and the time of the bringing of the suit; because of the continued receiving of the interest; because he received the note, which he still holds, and because he had filed suit predicated upon the validity of the contract.

Now, it would seem that the suit as originally instituted — showing the state of the mind of the plaintiff at that time — conclusively shows that the plaintiff understood and considered the contract to be in full force and effect. The existence of the mortgage came to the attention of Gaffney, plaintiff, apparently shortly after its execution; that about September following a note was given to him as an alleged compliance with the provisions of the contract. As to the note, it appears that he received it only in a qualified way, that is to say, the note was retained, but he understood, and contended, that the note did not comply with the requirements of the contract and demanded a note in accordance with the terms of the contract. Though there was some controversy on the subject, the note was retained and no other one issued, and he still held it at the day of the trial. This clearly shows that Gaffney ignored any breach of the contract that had taken place and that he apparently stood on the contract as an existent and valid one in all other respects. Certainly, about three and a half years have lapsed

during all which time he has drawn interest regularly, and as called for by the contract, and made no emphatic protest, so far as I recall from the record, about the mortgage in question, but apparently always looked to the first earnings for payment. From the whole record, it would seem clear that he had no intention of exercising any rights, as a result of that breach. On the contrary, it appears that he has always considered the contract in force, as clearly evidenced by the complaint filed on August 10th. Apparently, then, as an afterthought — that there might be some question about his recovering on the first ground — the matter of the 1926 breach was made a part of his complaint.

Now, as to his objection to the note. In view of what I have said is my judgment as to the earnings, it seems to me that the note is a fair compliance with the terms of the contract, even though the plaintiff was not as firmly secured as he had thought — acting as his own counsellor; therefore, he has no complaint in that respect.

When I refer to the objection made to the note, the only objection that I recall being made at the time was that it provided that payment was to be made out of profits instead of the first money coming into the hands of the company. It certainly purports to give Gaffney a first lien, and there is nothing else, so far as I can see or know, to which he could have objected. In fact, as I have said, the only objection that I recall him to have made at the trial was "the first earnings" part of the contract had not been COMPLIED WITH — NONE OTHER.

While this emphasis may be, and in a measure is, pleonastic, I feel that the stress is fully justified by the importance of the point.

The complaint, as distinguished from the "Amended Complaint", embodied apparently what was his thought on the subject during the last several years preceding its filing. Only as the result of an afterthought was this continuous

295

thought interrupted; it was interrupted too late. Whatever may have been his occasional observation regarding the note, he seems to have passed the mortgage entirely out of his mind, and I think intended to ignore it. Perhaps he was on such terms with Mr. Nolan, senior, as to cause this, as he believed Mr. Nolan, senior, an innocent holder for value.

 I believe that the above conclusion is in consonance with the authorities on the subject of waiver. In 40 Cyc., at p. 267, it is said that, "Waiver is a matter of fact to be shown by the evidence. It may be shown by express declarations, or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage, or it may be shown by a course of acts and conduct, and in some cases will be implied therefrom." At p. 265 of the same authority it is said that, "The more usual manner of waiving a right is by conduct or acts which indicate an intention to relinquish the right, or by such failure to insist upon it that the party is estopped to afterward set it up against his adversary," and at p. 263 of that authority it is said that, "the intention to waive need not necessarily be proved by express declarations, but may be shown by the acts and conduct of the parties, from which an intention to waive may be reasonably inferred, or even by non-action on their part."

██ ██ Of course, as said in Berman v. Fraternities Health, etc., Assoc., 107 Me. 368, 373, 78 Atl. 463, "It is essentially a matter of intention; and when the only proof of that intention rests in what a party does or forbears to do, his acts or omissions, the act relied upon should be so manifestly consistent with and indicative of an intention to voluntarily relinquish a then known particular right or benefit that no other reasonable explanation of his conduct is possible", and, as said in Fraser v. Aetna L. Ins. Co., 114 Wis. 510, 523, 90 N.W. 476, "Conduct indicating a waiver may be so inconsistent with a purpose to stand upon

one's rights as to leave no room for a reasonable inference to the contrary. Then the intent to waive appears as a matter of law."

██ - ██ "Waiver", as the court said in Fairbanks v. Baskett, 98 Mo. App. 53, 64; 71 S.W. 1113, "involves the notion of an intention entertained by the holder of some right to abandon or relinquish instead of insisting on the right." As said by the Court in Loftis v. Pacific Mut. L. Ins. Co. (Utah 1911), 114 Pac. 134, 139; "While some cases go to the extent of holding that unless the facts also constitute an estoppel in pais there is no waiver, in our judgment both reason and the weight of authority is (sic) against this view. The true distinction between an estoppel in pais is pointed out by Mr. Justice Lorigan of the Supreme Court of California in the case of Knarston v. Manhattan L. Ins. Co., 140 Cal. 57, 73 Pac. 740, and is also stated by Mr. Justice Sullivan in the case of Home F. Ins. Co. v. Kuhlman, 58 Neb. 488, 78 N.W. 936, 76 Am. St. Rep. 111. 'No doubt a waiver operates as an estoppel upon the party who waives; but it is not essential to waiver that a party in whose favor it is made must prove all the elements of an estoppel in pais before he is entitled to avail himself of the waiver'." To abandon or relinquish the right is the gist of waiver. Holloway v. Darden, 168 Ala. 256, 261, 53 So. 187. As said in Stiepel v. German American Mut. Life Assoc., 55 Me. App. 224, 233, " 'waiver' depends solely upon the intention of the party against whom it is invoked, and is in that respect essentially different from 'estoppel'."

██ In Marine Iron Works v. Wiess, 148 Fed. 145, 153, the court epitomized the matter thus: "We think it clear that the waiver of a right or benefit may be established by the actions, declarations, acquiescence, even silence, of a party, as well as by his expressed consent and approval." However, a mere indulgence is not a waiver, unless some element of estoppel enters into the matter, but this does

297

not mean that all silences are indulgences merely. A waiver may be by acquiescence or, even, silence alone, in many circumstances. If it can be gathered from his conduct, either active or passive, that he does not intend to pursue his right arising out of the breach, there is a waiver. Ordinarily, he should not sleep on his rights, but act on them with reasonable promptitude.

To consider the matter more concretely: the case of Kellner v. Rowe (Wash.), 242 Pac. 353, arose out of the assignment of a mortgage. It appears that the respondent thought that she was getting a piece of improved property free of liens, but it turned out that the property was neither improved nor free of liens. The court quoted from the opinion in Thomas v. McCue, 18 Wash. 287, 53 Pac. 161, the following declaration: "There is another principle adopted by the courts and which is often a controlling one in cases like the present, and that is, that, where one party to a contract intends to rescind it on account of a breach of it by the other, he must elect to do so speeedily on the discovery of such breach. Delay in rescission is evidence of a waiver of the misconduct of the other party and is itself deemed an election to treat the contract as valid and binding;" and then disposed of the case in hand by saying that: "In the present case the action was not brought until approximately ten months after the discovery by the respondent that the property covered by the mortgage was unimproved and six months after she was aware of the local improvement and general tax liens. With this knowledge through her representative she made repeated efforts to collect. It was not apparently until all hope of collecting the interest due at the time from Joseph was abandoned that the matter of rescission was considered, and under the circumstances of the case and the time which elapsed we think it must be held that the election to rescind

was not made with reasonable promptness," and, therefore, reversed the judgment of the lower court.

The above is, in my opinion, a true statement of the law of waiver, with which estoppel has many times been confused, and I adopt it as controlling in this case.

██ First: it would certainly seem reasonable to conclude that, by passing over the clear breach of 1926, and bringing suit upon what appeared to be a difficult matter of proof, which also involved a very controversial point of law, that breach was waived, albeit that subsequently, when the difficulty of recovery became more apparent, he then reached back to the breach of 1926 for support. If his idea was to get judgment — and whatever other idea could there have been in bringing suit? — why did he not base his claim on what seemed to be an almost indisputable ground, if he believed that it still existed, when he knew, definitely, that the defendant contended that no "earnings" had been made, else the claim would have been paid then, if not long before. On the first point his case was clear, it seems to me; on the second, it was most doubtful — both as to fact and as to law. The after thought, in adding the second count, does not invalidate this hypothesis, it seems to me.

Second: he collected his interest regularly in accordance with the contract for more than three years without any reservation in connection with the said breach. Even as late as May 28, 1929, the plaintiff was making a claim upon his contract as shown from this quotation from a letter of that date to the defendant company: "Receipt is hereby acknowledged of your letter of the first of May, 1929, advising me that the Corporation has not made any earnings since organization to date, and therefore no payment of my claim for $4502.53 U. S. Currency, with interest, as per contract of 20th January, 1926, can be made." Then, he continued in the same letter by making a demand upon the company for the privilege of examining the books in ac-

cordance with section 20, chapter 26, Title II, of the Code (1921; 13 V.I.C. §§ 73, 189) (See Exhibit No. 1). This privilege was accorded him. If the breach was open as a ground for suit, why should he bother himself about the matter of profits?

Third: that it appears from the whole record that he always insisted upon the payment of the claim out of the "earnings" of the company, is clearly evidenced by the letter of May 28, above quoted; he apparently never, certainly in the last several years, intended to take advantage of the breach of 1926, for reasons best known to himself; there is nothing in the evidence to the contrary, so far as I recall. He always insisted there were "earnings", within the meaning of the contract, out of which his claim could be paid, and apparently relied upon nothing else for the payment of it; that it appears that the only other point of which he at any time later made mention was concerning the note, and this point has been disposed of adversely to him.

Fourth: more than three years elapsed from the time of the breach which, in itself, would be a pretty clear indication of an intention to waive it. It is too late for a recrudescence of the breach now.

I am satisfied, that, from the conduct of the plaintiff and the circumstances of the case, there has been, as a matter of law, if not expressly, a waiver of the breach alleged in the second count, and I so hold.

I have filed Findings of Fact and Conclusions of Law showing that recovery can be had on neither count, consequently defendant is entitled to judgment, with costs.