**BRANCH BANKING & TRUST CO. et al. v. UNITED STATES (two cases).**

Nos. 47210, 47211.

United States Court of Claims.

July 9, 1951.

See also 87 F.Supp. 777, 115 Ct.Cl. 341.

The court, having considered the evidence, the report of Commissioner George H. Foster, and the briefs and argument of counsel, makes the following

## Special Findings of Fact

1. The individual and partnership plaintiffs in both of these cases are all citizens and residents of the State of North Carolina and the corporate plaintiff is organized under the laws of the State of Florida

with its principal place of business in the State of North Carolina. The plaintiff McDevitt & Street Company is a corporation formerly known as the J. J. McDevitt Company. Mr. Edward W. Grannis, named as a party plaintiff in each of the petitions as originally filed, has since died, and the coadministrators of his estate have been substituted as plaintiffs in both of these actions.

2. The two cases have been joined for purposes of trial, for the reason that they arose out of one cause of action and only one basic controversy is involved.

3. In December 1940 the defendant entered into a cost-plus-a-fixed-fee contract dated December 10, 1940, with the J. J. McDevitt Company, a corporation organized under the laws of the State of Florida, F. N. Thompson, an individual, E. W. Grannis, an individual, and V. B. Higgins, an individual, trading as V. B. Higgins Company, jointly and severally. Each of the parties named in the contract was at the time engaged in the contracting business in the State of North Carolina. In the performance of this contract the four contractors operated as the Grannis, Higgins, Thompson & McDevitt Company, and they will hereinafter sometimes be referred to as the contractor. The contract is identified as No. W–6826 qm–2. Under the terms of the contract the contractor was to construct an antiaircraft firing center, including the necessary buildings, temporary structures, utilities and appurtenances, later known as Camp Davis, near Wilmington, North Carolina. The cost of the project as estimated was $8,308,395, which estimate was later raised to $8,866,291. The contract provided that in addition to reimbursement of certain costs and rental of the contractor's equipment as set forth in the contract, plaintiffs should receive a fixed fee of $257,560, which fee was later raised due to increased work, to $270,943, as complete compensation for the contractor's services, including profit and all general overhead expenses.

4. The contractor was required to keep accurate records and books of account, to take all cash and trade discounts and rebates, and to account for and apply them in reducing the cost of the work. In addition, the contractor agreed at all times to use its best efforts in all acts under the contract to protect and subserve the interests of the Government. The contract also provided (a) that all work under the contract would be performed "in the shortest possible time," in accordance with the drawings and specifications, and "subject in every detail" to the supervision, direction, and instructions of the contracting officer; (b) that the contractor would not enter into any subcontract for any portion of the work "except in the form prescribed by the Secretary of War, nor without the written approval of the Contracting Officer," and (c) that the contractor would "at all times during the progress of the work keep at the site thereof a duly appointed and qualified representative who shall receive and execute on the part of the contractor such notices, directions and instructions as the contracting officer may give."

5. At the time the Camp Davis contract was negotiated, the parties representing the contractor conferred in Washington, D. C., with Mr. Lacy Moore, then Principal Construction Engineer and Chief of Section handling Cantons, Camps, Warehouses and Depots for the War Department. Mr. Moore introduced the members of the joint venture to Colonel Albertus Montgomery, the Constructing Quartermaster, and told them that all matters pertaining to the construction of Camp Davis were to be handled through Colonel Montgomery, as the representative of the contracting officer in charge of the contract work; and that if Colonel Montgomery required any advice as to any disputes or matters of any kind pertaining to his work, he was to contact Mr. Harry A. Fish, Supervising Constructing Quartermaster in the Washington office, who would secure the proper answers for him.

6. It was agreed between the contracting parties that Mr. Clarence Parke Street of the J. J. McDevitt Company should serve as project manager for the contractor on the Camp Davis job.

7. The work provided for in the contract was completed and accepted by the

defendant, said work having been terminated at the convenience of defendant on May 29, 1941.

8. Among the items of expenditures made by the contractor under and pursuant to the contract and for which it was entitled to be reimbursed by defendant were expenditures in the amount of $181,059.35, which were represented by a series of vouchers, a descriptive list thereof being attached to the petition in case No. 47210 as exhibit B. All of said items of expenditure totaling $181,059.35 were reimbursable items payable upon certification to and verification by the contracting officer of payrolls and invoices as provided in Article III of said contract. Reimbursement was not made with respect to said $181,059.35 nor any part thereof.

9. Of the total fixed fee of $270,942, provided under the terms of the contract, only $209,830.50 has been paid. The balance of said fixed fee amounting to $61,111.50 was duly verified and certified for payment by the contracting officer but said balance of the fixed fee has not been paid. The total amount of unreimbursed expenditures ($181,059.35) and unpaid balance of fixed fee ($61,111.50), for which claim is made in this suit with respect to said Camp Davis contract, is $242,170.85.

10. In addition to said Camp Davis contract hereinabove referred to and discussed (No. W–6826 qm–2, dated December 10, 1940), another contract identified as No. W–982–eng–1442, dated May 23, 1942, and commonly referred to as the Goldsboro contract, was entered into by and between the United States and a partnership consisting of E. W. Grannis, an individual, F. N. Thompson, an individual, V. B. Higgins Engineering Company, a partnership, and McDevitt & Street Contracting Company, a partnership, acting as joint coventurers under the name Grannis, Higgins, Thompson & McDevitt Company, for the construction of an Air Corps Technical School near Goldsboro, North Carolina. V. B. Higgins, who was a party to the Camp Davis contract, was a member of the partnership of V. B. Higgins Engineering Company.

11. The Goldsboro Contract No. W–982–eng–1442 was likewise fully performed by the contracting parties named therein and the work therein contemplated was duly completed and accepted by the defendant. For the performance of the undertakings under the Goldsboro contract, the contracting parties as named therein became entitled to receive from the defendant the sum of $10,920,575.24, of which amount they have been paid $10,827,279.25. In addition to the amount thus paid to said contractors by the defendant, the defendant is entitled to a credit of $16,119.55, representing rental due from the contractors to the defendant for Government-owned equipment used in connection with the work so performed, and a credit by way of discount in the amount of $27,176.44, leaving a balance that has not been paid to said contractors of $50,000 under the Goldsboro contract. The defendant tendered payment of $90.56 of the $50,000, which was refused, and $49,909.44 was withheld from payment.

12. The amount of $292,080.29 withheld from payments otherwise due under the two contracts was withheld as representing profits realized by Edward W. Grannis and Frederick N. Thompson under purchase orders placed with them by the contractor for materials needed for the work on the anti-aircraft firing center at Camp Davis.

13. When the work began it was discovered that the camp site was largely swampy ground, and it was necessary to use large quantities of sand and sand clay as a stabilizer. Only a small quantity of such material was found on the site, all of which was used. When it became apparent that large quantities of sand and sand clay would be required in the performance of the work, the contractor's project manager, Mr. Street, discussed with Colonel Montgomery the method to be employed in securing the material. It was decided that the cheapest, quickest and most efficient method to secure the material was to place purchase orders for its delivery on the site. Objection was raised to permitting the contractor to operate a sand or clay pit off the site. The contrac-

tor's representative was directed to secure bids and place purchase orders for the material with the lowest bidder.

14. Bids for sand clay were solicited in December 1940 and the low bid received was from Edward W. Grannis, one of the contracting parties. When it was determined that the bid of Mr. Grannis was the low bid, the contractor's project manager, Mr. Street, questioned the propriety of one of the contracting parties furnishing material under a subcontract and asked Colonel Montgomery, who was fully aware that Mr. Grannis was one of the contracting parties, to refer the question to Washington for a ruling with respect thereto. Colonel Montgomery telephoned to Mr. Fish in Washington and asked him to secure a ruling as to whether a subcontract for purchase of sand and sand clay could properly be awarded to one of the four contracting parties. Mr. Fish then contacted the Legal Department of the Construction Division of the War Department and was advised that there was no objection to securing this sand by purchase order from Mr. Grannis. Mr. Fish so reported to Colonel Montgomery, who in turn informed Mr. Street of the decision.

15. On December 21, 1940, Purchase Order No. 197 was issued by the purchasing agent for Grannis, Higgins, Thompson & McDevitt Company to E. W. Grannis for 200,000 cubic yards of sand clay to be delivered on the site by truck from a local pit, involving a truck haul of approximately 7½ miles, at $1.00 per cubic yard, which was the amount of the bid of Mr. Grannis. On March 25, 1941, the order was increased to 350,000 cubic yards at the same price. On April 24, 1941, Purchase Order No. 903 was issued by the purchasing agent to E. W. Grannis for 100,000 cubic yards of sand clay at 75 cents per cubic yard.

On January 11, 1941, the purchasing agent issued Purchase Order No. 802 to E. W. Grannis for 100,000 cubic yards of native sand, to be delivered at point of required use for filling holes in the roads, at 50 cents per cubic yard. On March 25, 1941, this order was increased to 300,000 cubic yards of native sand at the same price.

On May 7, 1941, Purchase Order No. 1103 was issued to E. W. Grannis by the purchasing agent for 250,000 cubic yards of native sand at 47½ cents per cubic yard.

All of these purchase orders were approved by the constructing quartermaster.

16. Due to the swampy condition of the site, there was at first difficulty and risk involved in delivery of the stabilizing material, but as the material was used to build roads over which later deliveries were made, deliveries became less difficult and involved less risk. Grannis operated at a profit from the first, and as conditions improved the profits became larger. By the middle of March 1941, the conditions affecting the delivery of the material had greatly improved. On May 29, 1941, when work on the camp was terminated, the unfilled balance of these purchase orders was canceled. Deliveries and payments for the material were as follows:

| | |
|---|---|
| P. O. 197, sand clay, 349,854 cu. yds. @ $1.00 | $349,854.00 |
| P. O. 903, sand clay, 58,868 cu. yds. @ $0.75 | 44,151.00 |
| P. O. 803, sand, 299,800 cu. yds. @ $0.50 | 149,900.00 |
| P. O. 1103, sand, 195,646 cu. yds. @ $0.475 | 92,931.85 |
| Total | 636,936.85 |

17. On February 11, 1941, the purchasing agent for Grannis, Higgins, Thompson & McDevitt Company issued a purchase order to F. N. Thompson, one of the four contracting parties, for the furnishing of B and C grade local sand for sand asphalt at a price of 88 cents per ton. This material was to be delivered to the plant or plants on the site and payment was to be made on the basis of the per ton mix in the asphalt plant. This purchase order was approved by the constructing quartermaster. On May 29, 1941, this purchase order was terminated. Delivery and payment was as follows: 53,379 tons at 88 cents: $46,973.52.

18. The unit prices set forth in the purchase orders to Grannis and Thompson were reasonable prices for delivery on the

site. Grannis and Thompson submitted invoices to the contractor for the material delivered, and these invoices were paid by the contractor.

19. After payment for the materials delivered under the purchase orders, vouchers for reimbursement for the money paid to Grannis and Thompson were submitted to and paid by the defendant. Prior to the payment of all the fixed-fee and reimbursement vouchers, the defendant discovered that plaintiff Grannis had realized a large profit out of the delivery of the material. By computing the cost to Grannis in accordance with the terms of the cost-plus-fixed-fee contract, the profit amounted to $283,245.14. The profit to Thompson in connection with his furnishing of the asphalt sand, computed on the same basis, amounted to $8,835.15. The profits so computed amounted to $292,-080.29.

20. The profit realized by Grannis as computed by the auditors of the defendant amounted to $283,245.14. According to the books and records of Mr. Grannis, his profit amounted to $203,190.72 only. The difference between the profits to Grannis as computed on the basis of a cost-plus-fixed-fee contract and on the basis of Grannis' books amounted to $80,054.42. This resulted from the disallowance by the defendant's auditor of the following amounts:

(a) In performing his subcontracts, Mr. Grannis used some equipment that was owned by a partnership of which he was a member, and he computed the cost of the use of said equipment on the basis of subcontractor or third party rentals, whereas the Government computed such cost on the basis of rental rates provided in Article II, paragraph 2, of the contract for use on the project of contractor-owned equipment. This increased the indicated cost $57,910.

(b) Mr. Grannis hired a number of trucks with operators to haul the sand and sand clay covered by his subcontracts, and as a result of mathematical errors in computing the amounts due to the owners of said trucks, they were paid $295.19 more than was due them.

(c) Certain shovels and bulldozers were rented and used in the clay pit operations by Mr. Grannis under agreements which provided for their repair. The cost of parts supplied after the work had been concluded, in the amount of $1,690.99, was paid by Grannis. This item was included by Grannis in computing the cost of supplying the material, but the defendant did not consider it a proper item of cost.

(d) A Federal tax of $6,443.64 was paid by Mr. Grannis on gasoline and oil used in the performance of his subcontracts and he included this amount as an item of cost. The defendant refused to consider it as an item of cost, as it would not have been paid by a cost-plus contractor for the Government.

(e) Mr. Grannis hired Mr. E. L. Godwin to serve as superintendent in charge of his subcontract operations, and in addition to his salary Mr. Godwin was reimbursed for expenses incurred by him in the performance of his duties. Expense accounts of Mr. Godwin for the period January 1, 1941, to May 29, 1941, for which he was reimbursed by Mr. Grannis, amounted to $3,-275.85. This amount was included by Mr. Grannis as an expense of performing his sand and sand clay contracts. Items amounting to $2,797.92 were not considered proper as being unsupported items.

(f) Mr. Grannis paid social security taxes of $2,194.13 with respect to the employees of truckers who hauled sand and sand clay under his Camp Davis subcontracts and he included that amount as a cost of performing the work. The defendant refused to consider this amount as an item of cost.

(g) Mr. Grannis carried collision, public liability and property damage insurance on the hired trucks used in performing his subcontracts, and the cost of said insurance was $7,860.03. This sum was included by Mr. Grannis as an item of cost of performing his subcontracts but the defendant refused to consider it as an item of cost.

(h) A legal fee of $750 was paid by Mr. Grannis to an attorney for his efforts in connection with the passage by the State Legislature of a law making it unnecessary

for hired trucks on Government projects to pay a so-called State "hire" tax. This amount was included by Mr. Grannis as a cost of performing his subcontracts, but it was disallowed by the defendant in its computations of profit.

(i) Wage checks in the amount of $112.52 were issued by Mr. Grannis that were never delivered. This amount was included in Mr. Grannis' subcontract cost computations but was eliminated by the defendant in its computations.

21. The profit realized by F. N. Thompson in the performance of the subcontract that was awarded to him for furnishing sand for use in the Camp Davis contract has been computed by defendant as amounting to $8,835.15. According to the books and records of Mr. Thompson, this profit amounted to $8,487.03 only, or a difference of $348.12. This difference represents Federal taxes paid by Mr. Thompson on gasoline and oil purchased by him and used in the performance of his subcontract. He included said taxes as a part of the cost of performing his subcontract, whereas the defendant refused to consider such items in its computation of cost.

Ward E. Lattin, Washington, D. C., for the plaintiff. Frank A. McCleneghan, Charlotte, N. C., and Gardner, Morrison & Rogers, Washington, D. C., were on the brief.

William A. Stern, II, Washington, D. C., with whom was Acting Asst. Atty. Gen. Newell A. Clapp, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiffs[1] sue to recover $292,170.85 withheld by defendant from payments which plaintiffs allege were due them under two contracts with defendant.

In December 1940, defendant entered into a cost-plus-a-fixed-fee contract (No. W–6826qm–2) with J. J. McDevitt Company, a corporation, E. W. Grannis, an individual, F. N. Thompson, an individual, and V. B. Higgins, an individual, trading as V. B. Higgins Company. Pursuant to the terms of the contract, the corporation and the three individuals were bound both jointly and severally as contractor.

Under the terms of the above contract, the contractor was to construct an antiaircraft firing center, including the necessary buildings, temporary structures, utilities and appurtenances, later known as Camp Davis, near Wilmington, North Carolina. ·

The contract provided (article I, 1, (c)) that in addition to reimbursement of certain costs and rentals of the contractor's equipment, the contractor should receive a fixed fee which would constitute *complete compensation* for the contractor's services, including profit and all general overhead expenses.

The contract contained the usual undertakings by the contractor regarding the keeping of accurate records and accounts, the taking of cash and trade discounts and rebates, and the use of the contractor's best efforts to protect and subserve the interests of the Government. The contract provided that all work would be performed in the shortest possible time in accordance with the drawings and specifications and "subject in every detail" to the supervision, direction and instructions of the contracting officer,[2] and further that the contractor would be reimbursed for actual expenditures in the performance of the work as approved by the contracting officer, including all subcontracts made in accordance with the provisions of the contract. Article V–1 (d) and (e) provided:

1. The Contractor hereby agrees that he will:

" *   *   *

"(d) Enter into no subcontract for any portion of the work, except in the form

---

1. The two cases have been joined for purposes of trial and both will be disposed of in this one decision inasmuch as they arose out of one cause of action and but one basic controversy is involved.

2. Article XIX of the contract provides in section 3: Except for the original signing of this contract, and except as otherwise stated herein, the term "Contracting Officer" as used herein shall include his duly appointed successor or his authorized representative.

prescribed by the Secretary of War, nor without the written approval of the Contracting Officer. Subcontracts are defined as contracts entered into by the Contractor with others which involve the performance, wholly or in part at the site of the work, of some part of the work described in Article I hereof.

"(e) At all times during the progress of the work keep at the site thereof a duly appointed and qualified representative who shall receive and execute on the part of the Contractor such notices, directions, and instructions as the Contracting Officer may give."

During contract negotiations in Washington, the members of the joint venture were informed that a Colonel Montgomery was to be the representative of the contracting officer in charge of the work and that if Colonel Montgomery required any advice concerning his work, he was to contact Mr. Harry A. Fish, Supervising Constructing Quartermaster in Washington who would secure the proper answers for him. The parties agreed that Mr. Clarence P. Street would serve as project manager for the contractor, as required by Article V-1(e), quoted above.

Early in the progress of work under the contract, it was discovered that the camp site was largely swampy and large quantities of sand and sand clay would be required as a stabilizer. Only a small quantity of such material was available on the site and it became apparent that most of it would have to be procured outside the site. As a result of discussions between the project manager and Colonel Montgomery, it was decided that the cheapest, quickest, and most efficient method of securing the material was to place purchase orders for its delivery to the site. Consideration was given to permitting the contractor to buy or rent trucks for the procurement of the necessary sand, but the contractor was informed by the defendant that the purchase of trucks had been forbidden by the War Department and that the rental of sufficient trucks was not feasible because of the unattractive recapture provisions required by the Government in rental agreements.

The project manager was accordingly directed to secure bids from persons who could supply the material, and to place purchase orders with the lowest bidder.

Bids for the sand and sand clay were solicited in December 1940, and the low bid received was from Edward W. Grannis who was one of the contracting parties. The project manager for the contractor questioned the propriety of the contractor entering into a subcontract with one of the contracting parties, and he asked Colonel Montgomery, the contracting officer, to secure a ruling on the matter from the appropriate source in Washington. Pursuant to his instructions, mentioned above, Colonel Montgomery telephoned to Mr. Fish in Washington and asked him to secure a ruling as to whether a subcontract for the purchase of sand and sand clay could properly be awarded to one of the four contracting parties. Mr. Fish contacted the Legal Department of the Construction Division of the War Department and was advised that there was no objection to securing the sand by purchase order from Mr. Grannis. Mr. Fish informed Colonel Montgomery of the ruling, who in turn advised the project manager to place the purchase order with Mr. Grannis.

On December 21, 1940, Purchase Order No. 197 was issued by the purchasing agent for the contractor to Mr. Grannis for 200,000 cubic yards of sand clay to be delivered on the site by truck from a local pit, involving a truck haul of approximately 7½ miles, at $1 per cubic yard. This purchase order was approved in writing by Colonel Montgomery as representative of the Constructing Quartermaster and contracting officer. On March 25, 1941, the order was increased to 350,000 cubic yards at the same price, and the "Change of Purchase Order 197" was approved in writing by Captain K. M. Pattee, as the representative of the Constructing Quartermaster. On April 24, 1941, Purchase Order No. 903 was issued by the contractor's purchasing agent to Mr. Grannis for 100,000 yards of sand clay at 75 cents per cubic yard. This purchase order was approved in writing by Lieutenant Alden E. Spees, for the Constructing Quartermaster.

Subsequently, further purchase orders for sand were placed with Mr. Grannis and with Mr. F. N. Thompson, another member of the joint venture, all with the approval of the Constructing Quartermaster. Only the first purchase order was placed as a result of competitive bidding. On being asked at the trial why further bids were not solicited before placing further purchase orders, the representative of the contracting officer testified that it was believed sufficient to merely review the original bids, and that was done. It was the opinion of the representatives of the Government charged with the duty of approving these purchases, that the prices paid were reasonable.

After payment by the contractor to Grannis and Thompson for the materials delivered under the purchase orders, vouchers for reimbursement for the money so paid were submitted to and paid by the Government to the contractor. Prior to the payment of all of the fixed fee and other reimbursement vouchers, the contracting agency discovered that Mr. Grannis had realized a large profit out of the transactions involving the purchase orders for sand and sand clay. By computing the cost to Grannis in accordance with the agency's interpretation of the terms of the cost-plus-a-fixed-fee contract with the contractor, the contracting agency determined the profit to Grannis to be $283,245.14 and to Thompson for the asphalt sand to be $8,835.15. Mr. Grannis disputed the amount of profit and submitted his books and records to support his contention that his profits were $80,054.42 less than the figure arrived at by defendant. The various items which make up this difference are analyzed in our finding 20. With respect to the purchase orders to Mr. Thompson, the difference in the amount of profit as computed by defendant and as claimed by Mr. Thompson is only $348.12 (Finding 21). In view of our disposition of this case it will not be necessary for us to resolve these differences.

The profits so computed by defendant were withheld from the contractor from funds which were otherwise due to plaintiffs on the Camp Davis contract and on another contract known as the Goldsboro Contract described in findings 10, 11, and 12.

Defendant contends that plaintiffs are not entitled to recover in this action because, being severally as well as jointly bound, the action of two of them in realizing a profit on the subcontracts was a breach of their covenant not to take any profit on the work aside from the fixed fee.

▉ It is clear that the action of the contractor in entering into the subcontracts and the actions of the two coventurers in accepting the subcontracts constituted a violation of the fixed-fee provision (Article I, 1(c)) of the contract. It is equally established that the transactions in question were fully approved in the manner required by the contract and by persons authorized to approve such matters unless such approval was beyond the authority of the contracting officer and his authorized representatives.

▉ On the matter of approval, defendant suggests first that the contracting officer was not apprised of the fact that the two coventurers anticipated making a profit on the transaction and that therefore his approval was not binding on the Government. The record indicates clearly that the contracting officer was aware that a profit was to be realized. If Grannis and Thompson were going to supply the materials at cost, there would have been no question regarding the propriety of the contractor dealing with them and no basis for a request for a ruling from the legal section of the War Department. It is true that defendant's representatives did not know how much profit the two men were to realize, but for that matter neither did the two men. The Government representatives who testified at the hearing insisted that the price quoted in the bid was a reasonable one and much lower than any other they were able to secure. They testified that in their opinion the amount of profit made by Grannis and Thompson was not their concern inasmuch as the price quoted by the two men was the lowest price obtainable.

Defendant's main contention, and the principal issue in the controversy, is that the contracting officer did not have the authority to waive the provision in the contract limiting the individual coventurers to the fixed fee allowed by the contract. The plaintiffs, on the other hand, contend that the contracting officer had full authority to waive such a provision, particularly where such waiver resulted in a benefit to the Government, and that having waived such a provision, the defendant is now estopped to claim that the consummation of the transactions resulted in a breach of the contract by the contractor.

The Government is neither bound nor estopped by the acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit. Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791. The instant contract was entered into pursuant to the Act of July 2, 1940, 54 Stat. 712, P.L. No. 703, 76th Cong., 3d Sess. We find nothing in that act expressly or by inference prohibiting the contracting officer from doing what he did in this case.

It is also well settled that estoppel cannot be set up against the Government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the Government. In Ship Construction and Trading Company, Inc., v. United States, 91 Ct.Cl., 419, the Government established as a fact that the Shipping Board did not authorize the contract in question and no contract resulted from the unauthorized act of one member of the Board. See also Walter C. Reediger, Inc., v. United States, 94 Ct.Cl. 120.

In general, an officer authorized to make a contract for the United States has the implied authority thereafter to modify the provisions of that contract particularly where it is clearly in the interest of the United States to do so. Goltra v. United States, Ct.Cl., 96 F.Supp. 618; 37 Op. Atty.Gen. 254 (1933); United States v. Corliss Steam-Engine Co., 91 U.S. 321, 23 L.Ed. 397; Satterlee v. United States,

30 Ct.Cl. 31; see also 28 Op.Atty.Gen. 121 in which the waiver proposed would have been prejudicial to the pecuniary interests of the United States.

In Corum v. United States, 81 F.Supp. 728, 112 Ct.Cl. 479, four companies as prime contractors contracted with the Government to do certain construction work on a cost-plus-a-fixed-fee basis. The contract obligated the Government to reimburse the prime contractors for expenses, including third-party rentals. The representative of the contracting officer approved a third-party lease which did not conform to the recapture requirements provided for in the prime contract. The Government later sought to avoid enforcement of the unorthodox recapture terms of the lease on the ground that such lease was invalid because it was beyond the power of the Government agents who purported to approve it and act pursuant to it, and because its terms were in clear violation of the prime contract and of the War Department's express instructions to its agents. The court held first that the officer approving the lease was clearly the contracting officer within the meaning of the contract. Next, the court found that this officer had the necessary authority to approve a lease which did vary from the type of lease prescribed by the prime contract and that the lease so approved was valid. The court further indicated that the Government, having reimbursed the prime contractors for the rentals paid under the lease, had in effect recognized its validity.

When the Government is acting in its proprietary capacity, its representative has authority to waive or modify a provision in a Government contract, and the Government may be estopped by such act of waiver in the same manner as a private contractor. The Falcon, D.C., 19 F.2d 1009; 1 A.L.R.2d 338.

In Dayton Airplane Co. v. United States, 6 Cir., 21 F.2d 673, the Government and the Airplane company, contractor, entered into a series of cost-plus contracts for the building of airplanes in 1917. At the conclusion of the contracts, an adjustment of most matters involved was negotiated and

agreed upon and the contractor was paid in full for all its allowed claims. With respect to a few small claims, the contractor continued to press its position before the proper departmental boards. Later, a departmental board concluded that the Government had made large overpayments to the contractor and for those amounts the Government brought suit in the District Court and recovered. The Circuit Court reversed and remanded the case and in so doing pointed out certain grounds for its action which seem pertinent in our consideration of the instant case. Speaking generally of cost-plus contracts with the Government and of the scope of the Government agents' authority under such contracts, the court said, 21 F.2d at page 674: "It is first to be observed that this contract and the actions under it were not made or taken by officers who must find in a statute clear authority for their every act. In such contracts with such an officer the public is dealing with an agent of known and limited powers. Once beyond these powers, principles of estoppel or fair dealing have no application against his principal. Here the scope of the contract was not limited by any statute. The government was acting by the Secretary of War, in a national emergency of the first class. His discretion was unlimited; it must be exercised through subordinates; in the absence of fraud or bad faith, the exercise of such delegated authority is the Secretary's exercise of it. Rules of estoppel and fair dealing apply in full force as with individuals. In this class of contracts, and for effect on future emergencies, if for no other reason, a sound public policy must require that the government keep its contracts and stand by its settlements as an individual must. In that atmosphere the questions of this case are to be approached." [Citing cases.] With respect to the authority of the Assistant Director of Aircraft Production to approve the making of motion pictures of the contractor's production work where the contract forbade the publication of such pictures, the court stated, in deciding that the contractor's expenses were reimbursable items of cost: "The permission and approval given by the assistant director cannot be overlooked. The contractor producing war-time necessities for the government, and who comes for instructions to the officer apparently in charge of the subject-matter, can hardly demand from that officer a written letter of authority from his immediate or remote superior before the conference is undertaken. We may take judicial notice, that the Director of Aircraft Production, like the Secretary of War himself, must act through his authorized representatives, and that, especially in wartime, a contract must contemplate such representation." 21 F.2d at page 681.

In the instant case the record is barren of proof that either Grannis or Thompson, or the group of coventures as contractor, sought to defraud the Government. The price contained in Grannis' bid, whatever profit it might involve for Grannis, was considerably lower than any other price the Government would have had to pay unless the Government had been willing to permit the contractor to deal directly with the numerous truckers who would be required to deliver the sand, and the Government was not willing to follow this latter procedure. After the placing of the first purchase order, the Government approved an increase in that order and then approved a number of additional purchase orders without requiring further competitive bidding, in the conviction that whatever Grannis' profit, the price was reasonable and the best one obtainable for the Government. We do not have the situation here which was present in the case of Lord Manufacturing Company v. United States, 84 F.Supp. 748, 114 Ct.Cl. 199, certiorari denied 339 U.S. 956, 70 S.Ct. 978, in which we held that the Government need not pay to the plaintiff the prevailing ceiling price for the goods in question where such price netted the plaintiff a huge profit. In that case the Government elected to proceed under a statute which empowered it to fix a price which from all points of view, including the reasonableness of the profit to be earned by the seller, was a reasonable one.

The Government did not choose to so deal with Mr. Grannis or Mr. Thompson. On the contrary the Government elected to deal at arms length and continued to do so for many months during which it might have investigated the profits being made and called a halt to a course of action which it now seeks to avoid. In State ex rel. Washington Paving Co. v. Clausen, State Auditor, 90 Wash. 450, 156 P. 554, the court said at pages 554 and 555, L.R.A. 1917A, 436: "We have repeatedly held that in its business relations with individuals the state must not expect more favorable treatment than is fair between men. * * We have not to do here with the question of limitation of actions, nor with laches, but with estoppel in pais, and, even where the government may not be barred by mere laches, it may be estopped in pais by such actions with individuals as make it a 'question of honest dealing.' * * * This is not a case of estoppel claimed by mere inaction of public officers. It is a case of their acting. Daily did those officials not only permit the delivery of labor and material on the public property, but see to it that it was laid to suit them." In the above case the court also held that the contractor was entitled to the contract price and need not be relegated to a recovery on the basis of *quantum meruit*. The court pointed out that the contract was let as a result of competitive bidding; that the Board was competent to contract and no fraud was alleged against the Board; that the secret fraud of the bidder had not impaired the statutory machinery of the contract and the bidder's fraud was one which could be waived; that the contract at most was merely voidable and that the state had elected not to void it. See also State v. Horr, 165 Minn. 1, 205 N.W. 444; W. H. Armstrong and Company v. United States, 98 Ct.Cl. 519.

■ In Knight, Adm'r v. United States, 35 Ct.Cl. 129, the court pointed out that while the sovereign may not waive without the authority of a statute *public* rights, it can be estopped of its legal rights when it is acting in matters of executive administration. See also W. E. Callahan Construction Co. v. United States., 91 Ct.Cl. 538, where it was held that the contracting officer validly waived the time limitation provision contained in a Government contract when he considered and decided on their merits certain protests made by plaintiff outside the time limit fixed by the contract. The court held the Government bound by such act of its contracting officer.

■ Defendant suggests that in order that the doctrine of estoppel be invoked against the Government, there must be a representation made by the Government which is false and which was acted upon by the contractor to his detriment. We cannot agree with this theory. In Mahoning Investment Company v. United States, 3 F.Supp. 622, 78 Ct.Cl. 231, a parent company and its subsidiary were held estopped to question the legality of the collection of a tax where both had agreed to the assessment (a mistaken one), had acquiesced in the notice and demand for payment and had paid the tax, the time during which the Government might make a further assessment having expired. Among other things, the court said that it was not necessary that the person sought to be estopped must have intended to mislead the other party: "It is sufficient, as we think, that he pursued such a course as naturally would and did mislead them to the prejudice of the defendant. This prejudice is apparent, for the statute of limitations with reference to the making of the assessment had not then expired." 3 F.Supp. at page 630, 78 Ct.Cl. at page 248.[3]

On the matter of estoppel, the court said: "The doctrine of equitable estoppel, or more properly as we think *quasi* estoppel, is gradually being extended by the modern courts to prevent a wrong being done 'wherever, in good conscience and honest dealings,' a party ought not to be permitted to repudiate his previous statements and declarations." 3 F.Supp. at page 630, 78 Ct.Cl. at page 248. See also Stevens Manufacturing Co. v. United States, 8 F.Supp. 720, 80 Ct.Cl. 183.

3. See also Marine Iron Works v. Wiess, 5 Cir., 148 F. 145.

In summary, we are persuaded that the subcontract in question was not induced by fraud or misrepresentation. The proposed transaction did constitute a violation of the fixed-fee provision of the contract inasmuch as the members of the joint venture were bound severally to the contract terms. The Government representatives were aware of this fact and for that reason sought a ruling as to their authority to waive the contract provision prohibiting such a transaction. There existed no statutory or other limitation on the government agent's right to so modify the contract and to the extent that Grannis' bid was lower than the others received, the Government received a benefit from such modification. The officers of the Government approving the first and subsequent purchase orders were fully authorized so to do. With the approval of the authorized agents of the Government, plaintiffs purchased the material at the approved price, used it for the benefit of the Government, paid the seller and were reimbursed by the Government. Also with the approval of the authorized agents of the Government, two individual members of the joint venture sold the material to the contractor and were paid the purchase price. The Government is now estopped to deny the binding effect of the actions of its duly authorized representatives in approving these transactions and plaintiffs are entitled to recover the balance of the fixed fees and unpaid items of reimbursements due and withheld by the Government. The plaintiffs (Branch Banking and Trust Company, et al.), in case No. 47210, may recover $242,170.85,[4] and the plaintiffs (Branch Banking and Trust Company, et al.) in case No. 47211 may recover $50,000.[5]

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

4. See findings 7, 8 and 9.

5. See findings 10 and 11. The sum of $50,000.00 in case No. 47211 includes $90.56 which the Government was willing

to pay plaintiffs and which was tendered to plaintiffs and refused by them.

