**John RAPP, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Crown Publishers, Inc., Third-Party Defendant.**

**No. 495–80C.**

United States Claims Court.

June 21, 1983.

Andrew F. Dempsey, Jr., Washington, D.C., with whom was Donald A. Tobin, Washington, D.C., for plaintiff.

Francis J. Sailer, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

William E. Melahn, Boston, Mass., for third-party defendant.

## OPINION

KOZINSKI, Chief Judge.

### FACTS

On September 11, 1974, plaintiff attended a United States Customs Service public auction of seized, unclaimed or abandoned merchandise. Plaintiff bid successfully on 12 separate lots of books, among them lot 140 consisting of approximately 1,250 copies of a work entitled *Daphnis and Chloe* which, according to plaintiff, is the only known work of the second century Greek author Longus. The books were being auctioned because the government thought that the consignee had failed to take delivery of them and to make certain payments due the Customs Service.

The auction was conducted in accordance with a notice entitled "Conditions of Sale" which was published in the auction catalog. Paragraph 4 of this notice directed successful bidders to make payment at the auctioneer's warehouse on September 12, 1974. According to plaintiff, however, during the course of the auction the auctioneer orally amended this paragraph, declaring that payment could be made either on September 12 or on September 13.

Shortly after the auction, the Customs Service learned that the consignee might, in fact, have paid some or all of the charges due on lot 140 and that it was demanding release of the books. An order was immediately issued to stop delivery of the lot to plaintiff.

On September 13, 1974, plaintiff arrived, money in hand, to pick up his 12 lots. Payment was accepted for 11 of them; without explanation, payment was rejected for lot 140. Plaintiff took possession of the 11 lots. As to lot 140, plaintiff insisted on tendering a check which the Customs Service agent took, noting "[p]rovisional payment accepted" on plaintiff's receipt. Defendant has never returned this money.

Several years of litigation ensued in the United States District Court for the District of Massachusetts. That case involved the same three parties as here—John Rapp, the United States and Crown Publishers (successor in interest to the original consignee). The district court issued a temporary restraining order prohibiting the United States from releasing the books. The TRO remained in effect throughout the five years of the district court action. The district court eventually dismissed the complaint as falling outside its Tucker Act jurisdiction because plaintiff's claim exceeded $10,000.

In June 1980, the government released the books to Crown in exchange for Crown's execution of an agreement to hold the United States harmless "from liability of any nature or kind ... for or on account of any and all law suits ... resulting from the ... release of books to Crown Publishers Inc." On September 10, 1980, three days before the statute of limitations would have expired, plaintiff brought suit in this court.

## ISSUES PRESENTED

The matter is before the court on tri-motions for summary judgment. Plaintiff takes the view that he bought the books fair and square at the September 11, 1974, auction and that he was entitled to them when he came to pay on September 13, 1974. Once the auctioneer banged his gavel, plaintiff argues, he and the United States had entered into a binding contract which the government later breached by refusing delivery.

The United States argues that it was entitled to rescind the auction sale because plaintiff failed to tender the purchase price on September 12, 1974, as specified in the Conditions of Sale. In the government's view, even if the auctioneer purported to extend the time for payment, the announcement was unauthorized and therefore not binding on the United States. Alternatively, defendant argues that if it is liable in damages to plaintiff, it is entitled to full indemnification from Crown under the terms of the June 1980 agreement. On that basis it seeks summary judgment against Crown.

Crown also argues that the United States was entitled to rescind the auction sale. In addition, Crown argues that the United States was not entitled to sell the books at the September 1974 auction and that the indemnification agreement does not shift to it responsibility for the government's negligence. Plaintiff takes no position as to the dispute between the United States and Crown.

## DISCUSSION

A. *The Existence of a Contract*

1. Defendant initially expresses skepticism as to whether the announcement extending the date for payment was in fact made by the auctioneer and demands a trial to resolve the issue. However, defendant presents no factual support for its position.

Indeed, defendant concedes that it has no evidence at all to refute plaintiff's assertion and would present none at trial.[1]

By contrast, plaintiff, who was present at the auction, has filed an affidavit asserting that the announcement was made. Moreover, he points to objective evidence supporting his contention: when plaintiff arrived to pick up his merchandise on September 13, the customs officials were on hand at the warehouse and were ready and willing to accept payments and to deliver merchandise sold at the auction. The officials in fact accepted payment and delivered to plaintiff 11 lots; no one, apparently, objected to the delayed payment. Even as to lot 140, payment was accepted provisionally, with no indication that the one day's delay in payment was the source of concern. There is every indication, therefore, that the auctioneer made the announcement in question and that everyone was aware of it and acted accordingly. Indeed, the government concedes that throughout the protracted litigation in the district court, it never raised this as a point of dispute. *See* n. 4 *infra.*

Summary judgment is not appropriate where there is a genuine dispute as to material facts. *Lomas & Nettleton Co. v. United States,* 1 Cl.Ct. 641 (1982) (WHITE, S.J.). On the other hand, summary judgment should not be denied on the basis of a party's unsupported refusal to concede its opponent's documented factual contentions. RUSCC 56(e). *See Ables v. United States,* 2 Cl.Ct. 494 at 503–504 (1983) (LYDON, J.) & authorities cited therein. Here, plaintiff has amply supported his allegation that the auctioneer made the announcement extending the time for payment to September 13; defendant has conceded that it will be unable to present evidence to the contrary. Trial on that issue is therefore unnecessary and the court finds that the announcement was in fact made as alleged by plaintiff.[2]

■ 2. Defendant next argues that even if the announcement was made, it was not binding on the United States because it was unauthorized. In support of that contention it presents an affidavit of the person who was District Director of Customs in Boston in 1974. The affiant declares that he was "the sole official with authority to sell unclaimed and abandoned merchandise at public auction in the Boston District in 1974. No one else had such contracting authority." The affiant further states that he did not modify the Conditions of Sale and did not authorize anyone else to modify them at the September 11, 1974, auction. On the basis of these representations, defendant argues that whatever may have been said by the auctioneer was without legal effect and should be ignored. In defendant's view, if plaintiff was gullible enough to believe a Customs Service officer presiding at a public auction, that's his tough luck.

The affidavit of the former District Director must be dismissed as contrary to fact. Customs Service regulations provide that auctions "may be conducted by the district director, any employee designated by him or by a public auctioneer." 19 CFR § 127.27. The auction was in fact conducted by a Customs Service employee. *See* n. 1 *supra.* It is simply incredible that this employee could have conducted the public auction without being delegated appropriate authority pursuant to this section.[3]

---

1. It is curious that defendant is not proposing to present the testimony or affidavit of the auctioneer. According to defendant, that individual was a Customs Service employee whose whereabouts were known as late as July 1981. Defendant's Answer to Plaintiff's Interrogatory No. 2 (July 16, 1981).

2. Because third-party defendant Crown has no first-hand knowledge of the events surrounding the September 11, 1974, auction, the court has allowed it to take further discovery and move for reconsideration of this ruling if it should find any evidence casting doubt upon plaintiff's story.

3. Indeed, in its answers to plaintiff's interrogatories, defendant consistently refers to the auctioneer as "the authorized U.S. Customs officer." *See, e.g.,* Defendant's Answer to Plaintiff's Interrogatory No. 9 (July 16, 1981).

The delegation of authority to the auctioneer allowed him to exercise substantial discretion as to various aspects of the sale. He was, of course, given the authority to determine who was the highest bidder and, by banging the gavel, to consummate each transaction on behalf of the United States. Moreover, the auctioneer was delegated absolute discretion to temporarily postpone bidding on a lot or to withdraw it from sale altogether "if for lack of competitive bidding, the auctioneer considers the highest bid insufficient to warrant sale." Conditions of Sale ¶ 2. Finally, the sale notice provided that "[a]ll other conditions affecting individual lots as announced by the Auctioneer are hereby made part of the conditions of this sale." *Id.* ¶ 6.

■ These circumstances indicate that the auctioneer was performing contracting functions for the United States and was vested with significant discretion. The former District Director's blanket assertion to the contrary, made in an affidavit prepared almost eight years after the incident, casts doubt upon the accuracy of his recollection or upon his understanding as to the legal effect of his actions. The fact is that a delegation pursuant to 19 CFR § 127.27 must have been made, either formally or informally, giving the auctioneer broad contracting authority. One who is authorized to contract on behalf of the United States "has the implied authority thereafter to modify the provisions of that contract particularly where it is clearly in the interest of the United States to do so." *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 87, 98 F.Supp. 757 (1951).

Even if the District Director had limited the delegation of authority to preclude the auctioneer from making the announcement, such limitation would not be effective absent a showing that those present had actual or constructive notice of such limitation. *See AST/Servo Systems, Inc. v. United States,* 196 Ct.Cl. 150, 155 (1971); *Kurz & Root Co.,* 74–1 B.C.A. (CCH) ¶ 10,543, at 49,942 (1974); 1 R. Nash & J. Cibinic, Jr., *Federal Procurement Law* 62 (3d ed. 1977). Cases such as *Federal Crop Insurance Corp.*

*v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) and *Atlantic Gulf & Pacific Co. v. United States,* 207 Ct.Cl. 995 (1975), turned upon the existence of regulations which limited the agent's authority to bind the United States. The regulations gave the public constructive notice of those limitations in the agent's authority. *Merrill,* 332 U.S. at 384–85, 68 S.Ct. at 3–4; *Atlantic Gulf,* 207 Ct.Cl. at 996–97. Here, the only applicable regulation was 19 CFR § 127.27 which contained no limitation as suggested by defendant. Fairly read, the regulation notified the public that if the auction was conducted by someone other than the District Director, that person would be exercising the District Director's authority with respect to the auction.

■ Moreover, the sale notice itself— signed by the District Director—stated that the auctioneer was authorized to make announcements modifying the Conditions of Sale. Defendant argues that because the notice permits the auctioneer to announce only "other conditions" of the sale, it implicitly precludes announcements modifying terms already in the notice. While this construction of the notice is possible, it is certainly not required. The terms of a contract are construed against the drafter. *United States v. Seckinger,* 397 U.S. 203, 210, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970); *Folk Construction Co. v. United States,* 2 Cl.Ct. 681 at 688 (1983) (WHITE, S.J.; *A & K Plumbing & Mechanical, Inc. v. United States,* 1 Cl.Ct. 716, 723 n. 11 (1983) (SETO, J). Where, as here, a public announcement is involved, its terms must be construed as they would have been understood by a member of the public. The court concludes that those attending the auction would not have perceived the fine distinction pressed here by the government but would have read paragraph 6 of the Conditions of Sale as authorizing the auctioneer to make the announcement permitting delayed payment.

■ Finally, if any question remains as to the auctioneer's authority, it is rendered moot by the Customs Service's ratification

of the announcement. Everyone concerned acted in accordance with the announcement; no suggestion was made that the auctioneer lacked authority until now. Eleven lots of books were delivered to plaintiff on September 13, 1974, without any suggestion that the payment for them was late or otherwise defective.[4] Defendant never disavowed the auctioneer's announcement during the protracted litigation in the district court. The argument of lack of authority appears to have been an afterthought, wholly at odds with defendant's actions.

Accordingly, the court concludes that the auctioneer was authorized to extend the period of payment to September 13, 1974, and that, in any case, his actions were later ratified; that plaintiff reasonably relied upon the auctioneer's announcement; and that he tendered payment for lot 140 in a timely fashion.

### B. *The Indemnification Agreement*

 Under the June 1980 indemnification agreement, Crown promised to hold the United States harmless from any liability "resulting from the ... release of books" to it. However, defendant's 1980 release of books to Crown has no bearing on plaintiff's case in this court. Plaintiff's cause of action for breach of contract arose in 1974 when the United States refused delivery. The remedy plaintiff seeks—and the only remedy this court can offer—is payment of money damages for the breach.[5] *See Public Service Co. v. United States,* 2 Cl.Ct. 380

at 382–383 (1983) (SETO, J.). The court cannot order return of the books and, indeed, plaintiff has disavowed any interest in them. Defendant would therefore be equally liable in damages to plaintiff had it kept the books.

Since the damages defendant will be required to pay for the 1974 breach of contract are not ones "resulting from the ... release of books to Crown" in 1980, Crown is not liable to the United States under the indemnification agreement.

### CONCLUSION

Plaintiff's motion for summary judgment on the question of liability is granted. Defendant's motion for summary judgment against plaintiff is denied. Defendant's motion for summary judgment against third-party defendant is denied.

The case is set for trial on the question of damages at 10:00 a.m. on July 15, 1983, in Courtroom No. 4, Fifth Floor, National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005.

---

4. It is worth noting that plaintiff would have fared no better as to lot 140 had he tendered payment on September 12 rather than on September 13. Defendant admits that the order to refuse delivery was given on the morning of September 12. Defendant's Answer to Plaintiff's Interrogatory No. 16 (July 16, 1981). As defendant's response to an interrogatory from the district court action makes clear, the order was given because of doubts about whether the books should have been put up for sale; it had nothing at all to do with plaintiff's purportedly late payment:

> *Int. No. 13.* What is the basis for defendant's refusal to deliver said Lot # 140 to the plaintiff?
>
> *Answer No. 13.* It was ascertained subsequent to the auction date but prior to [September 13, 1974] that a customs entry had been filed on a date prior to the auction covering the merchandise which made up said Lot # 140.

Defendant reaffirmed this position in this litigation. *See* Defendant's Answer to Plaintiff's Interrogatory No. 22 (July 16, 1981).

5. By contrast, the district court action appears to have involved a claim for specific performance, as evidenced by the order entered precluding release of the books by the Customs Service. *See* p. 696 *supra.* The indemnification agreement seems to have contemplated a situation where the United States would incur liability because it could no longer deliver the books.